AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

<table>
<tr><td>In the Matter of the Search of<br><br>PMB 377 AT UPS STORE AT 3144 G<br>STREET, MERCED, CA 95340,</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.    2:26-sw-0485 CKD</td></tr>
</table>

**FILED**

**Jun 04, 2026**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute a Controlled Substance |
| 18 U.S.C. § 1956(a)(1) | Money Laundering |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Sworn to and signed telephonically.

Jedediah Tyler, USPIS Postal Inspector
*Printed name and title*

Date:  June 4, 2026 at 1:19 pm

*Judge's signature*

City and state:  Sacramento, California

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

ERIC GRANT
United States Attorney
CHARLES CAMPBELL
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of:<br><br>PMB 377 AT UPS STORE AT 3144 G STREET, MERCED, CA 95340, | CASE NO.<br><br>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS |

I, Jedediah Tyler, being first duly sworn, hereby depose and state as follows:

## I.    **AGENT BACKGROUND**

1.      I am a Postal Inspector with the United States Postal Inspection Service (USPIS), currently assigned to the Stockton, California domicile.  I investigate criminal violations of federal and state law, including illegal narcotics, firearms, and illicit proceeds being sent through the U.S. Mail; money laundering; robbery and burglary of postal employees and facilities; destruction of government property; theft/possession of stolen U.S. Mail; mail and bank fraud; and identity theft crimes.  I am a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure; that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

2.      I have been a Postal Inspector since January 2020.  I am currently assigned to the Stockton Domicile, San Francisco Division, of the United States Postal Inspection Service.  In addition, I am also assigned as an Agent with the San Joaquin County Metropolitan Narcotics Task Force.  During

AFFIDAVIT
1

my tenure, I completed training at the United States Postal Inspection Service Basic Inspector Training in Potomac, MD.  I have completed the USPIS Basic Contraband Interdiction & Investigation course. As part of my official duties, it is my responsibility to investigate violations of federal and state law, including robbery and burglary of postal facilities, destruction of government property, theft of U.S. Mail, possession of stolen U.S. Mail, mail and bank fraud, credit card fraud, identify theft, and unlawful transportation of contraband, including firearms, controlled substances, and proceeds of the sale of controlled substances through the U.S. Mail.  Through my training, experience, and interaction with other experienced Postal Inspectors and other drug trafficking investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs; to collect and conceal drug-related proceeds; to communicate with other participants to accomplish such objectives; and to use the mail to conduct their illegal operations.

3.      Based on my training and experience, I know that drug traffickers use their vehicles to store and transport narcotics and other contraband, often by concealing the controlled substances in hidden compartments of their vehicles. Drug traffickers also store firearms in their vehicles to protect their drug proceeds.  Drug traffickers also use their vehicles to purchase supplies of drugs, distribute drugs to customers, and collect money from their customers.  For example, drug traffickers frequently use their vehicles to drive to neutral meeting locations to meet with suppliers or customers, where drugs are exchanged for money (often inside of the drug dealer or customer's vehicle).  Thus, evidence of drug distribution can often be found in a trafficker's vehicle.

4.      In addition to my personal knowledge, this affidavit is based on (1) information I obtained from related investigations; (2) conversations with other law enforcement officers including oral and written investigative and laboratory reports that I received directly or indirectly from other law enforcement officials; (3) review and analysis of information received from various sources, including evidence provided pursuant to subpoenas and search warrants, such as GPS tracking data; (4) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (5) a review of public records, telephone toll records, and subscriber information; (6) information provided from confidential sources of information and other sources of information working with law enforcement agencies; (7) a review of driver's license and automobile registration records; (8) records

AFFIDAVIT

2

from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (9) my training and experience as a Postal Inspector and/or; (10) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## II.     INTRODUCTION

6.     As discussed in further detail below, MENDOZA, JOHNSON, and PEREZ are members of a drug trafficking organization (the MENDOZA DTO) that distributed large quantities of controlled substances throughout the United States, primarily using the U.S. Mail.  During the investigation, members of the MENDOZA DTO used UPS Store Private Mail Box (PMB) number 377 at the UPS Store located at 3144 G Street, Merced, California 95340 ("MENDOZA'S UPS STORE BOX") to receive parcels containing cash which represented the proceed of drug sales. When a confidential informant performed a controlled buy of methamphetamine from the MENDOZA DTO, the informant was instructed to mail cash to MENDOZA'S UPS STORE BOX.  Shortly after the informant informed the MENDOZA DTO that the cash had been delivered, MENDOZA was observed visiting the Merced UPS Store where MENDOZA'S UPS STORE BOX is located.

7.     Agents performed a takedown operation on the MENDOZA DTO on March 26, 2026. As part of the operation, agents arrested MENDOZA, JOHNSON, and PEREZ, and searched multiple residences and locations linked to the DTO.  At these locations law enforcement discovered the following: approximately 41 kilograms of suspected cocaine, approximately 51 kilograms of suspected ecstasy, approximately 11 kilograms of suspected ketamine, approximately 2 kilograms of suspected LSD tabs, approximately 192 kilograms of suspected methamphetamine (in the form of counterfeit Adderall pills), approximately 43 kilograms of suspected THC vapes, over $230,000.00 in US Currency,

AFFIDAVIT

3

and two firearms.

8.     At BIG TYME AUTO, a business operated by members of the MENDOZA DTO, agents also found several USPS Priority Mail parcels addressed to Justin Selph at MENDOZA'S UPS STORE BOX.

9.     The initial investigation which led to the takedown of the MENDOZA DTO is detailed fully in the affidavit used for the takedown search warrants.  One of those search warrants is included as Exhibit 1, and the contents of Exhibit 1 are incorporated fully herein.  This affidavit contains the portions of the investigation which directly pertain to the MENDOZA DTO's use of MENDOZA'S UPS STORE BOX, and which create probable cause for a search of that box.

10.     Based on my training and experience, I believe there is probable cause that MENDOZA, JOHNSON, and PEREZ are engaged in a conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846(a); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

11.     This affidavit is made in support of a search warrant for the UPS Store Private Mail Box (PMB) number 377 at the UPS Store located at 3144 G Street, Merced, California 95340 ("MENDOZA's UPS STORE BOX"), more fully described in Attachment A;

12.     The search warrants seek to search the above property for evidence, instrumentalities, contraband, and fruits of violations of 21 U.S.C. § 846, conspiracy to distribute and possess with intent to distribute controlled substances, and 18 U.S.C. § 1956(a)(1)(B)(i), money laundering (the TARGET OFFENSES), as more fully described in Attachment B.

### III.     PROBABLE CAUSE

#### A.     Identification of Jose MENDOZA, Jessy JOHNSON and Alejandro PEREZ as members of the MENDOZA DTO.

13.     During surveillance of the LASSITER WAREHOUSE on September 18, 2025, agents observed MENDOZA entering and exiting the LASSITER WAREHOUSE.  Agents also observed an individual later identified as Jessy JOHNSON exit the LASSITER WAREHOUSE.  Physical surveillance of JOHNSON also identified JOHNSON'S VEHICLE and JOHNSON'S RESIDENCE.

    a.     On September 18, 2025, agents conducted a surveillance operation at the LASSITER WAREHOUSE.  On that date, they observed MENDOZA'S VEHICLE parked outside

AFFIDAVIT

4

the warehouse.  Agents also observed a gray 2025 GMC Sierra with California license plate 26287F4 (JOHNSON'S VEHICLE) parked at the LASSITER WAREHOUSE.  A check of DMV records determined that the gray GMC Sierra was registered to Jessy JOHNSON.  The same records stated that JOHNSON's address was 2101 East Linwood Avenue, Turlock, California (JOHNSON'S RESIDENCE).

b. As stated above, during the September 18, 2025, surveillance of the LASSITER WAREHOUSE, agents observed Jose MENDOZA drive from the warehouse to the Turlock Post Office to drop off a bag of parcels, at which point MENDOZA returned to the LASSITER WAREHOUSE.[1]  At approximately 5:07 PM, METRO agents observed a white male wearing a black shirt, black shorts, and a hat exit the LASSITER WAREHOUSE.  This individual was identified as Jessy JOHNSON using DMV records.  JOHNSON entered JOHNSON'S VEHICLE and drove away.  At approximately 5:18 PM, METRO agents observed JOHNSON pull into the carport at JOHNSON'S RESIDENCE and park his vehicle.  Also in the carport was a white Lexus SUV with California license plate 9TRR220, which DMV records show is registered to Araceli Mendoza-Ayala at JOHSON'S RESIDENCE.

14.    On September 25, 2025, agents saw JOHNSON, MENDOZA, and an individual later identified as Alejandro PEREZ move multiple vehicles and parcels between MENDOZA'S RESIDENCE, JOHNSON'S RESIDENCE, the LASSITER WAREHOUSE, the Merced UPS Store, and BIG TYME AUTO.  Of note, MENDOZA visited BIG TYME AUTO and the LASSITER WAREHOUSE before dropping off nine parcels at the Turlock Post Office.  I searched one of those parcels and found approximately 400 grams of suspected methamphetamine.

a. At approximately 7:58 AM, METRO agents observed JOHNSON at JOHNSON'S RESIDENCE, parking JOHNSON'S VEHICLE.  At approximately 9:28 AM, a METRO agent observed JOHNSON enter JOHNSON'S VEHICLE and drive away.  Agents followed JOHNSON until he arrived at the LASSITER WAREHOUSE.  JOHNSON

---

[1] MENDOZA was identified based on agents existing familiarity with him, and through comparison of MENDOZA's appearance with MENDOZA's DMV photo.

AFFIDAVIT

5

unlocked a large gate and parked at the rear of the warehouse.

b. At approximately 11:28 AM, METRO agents observed MENDOZA at the MENDOZA RESIDENCE handling and taping shut a large brown box.  Agents observed MENDOZA grabbing multiple boxes and placing them on the porch of MENDOZA'S RESIDENCE.  At approximately 11:41 AM, agents observed MENDOZA exit the property and drive off in MENDOZA'S VEHICLE.

c. At approximately 11:45 AM, agents observed MENDOZA arrive at the UPS Store, 3144 G Street, Suite 125, Merced, California 95340 (the "Merced UPS Store").  MENDOZA entered the Merced UPS Store.  MENDOZA then exited with multiple medium-sized brown and white boxes, entered his vehicle, and left the area.

d. At approximately 11:56 AM, agents observed MENDOZA arrive at the business located at 1104 East Childs Avenue, Merced, California 95341 (BIG TYME AUTO).[2]

e. At approximately 11:51 AM, METRO agents observed a white GMC Sierra bearing California license plate 33291L3, registered to Jessy JOHNSON, arrive at MENDOZA'S RESIDENCE towing a large dump trailer.  At approximately 12:11 PM, agents observed the driver of the white GMC Sierra load the boxes that MENDOZA had left onto the porch into the large dump trailer.  A later examination of records held by the California DMV and Homeland Security Investigations (HSI) revealed this individual to be Alejandro Felguerez PEREZ.

f. PEREZ then left MENDOZA'S RESIDENCE driving the truck and trailer.  At approximately 12:42 PM, the white GMC with the trailer arrived at BIG TYME AUTO.  A motorcycle bearing California license plate 24H7185, registered to Jose Antonio Felguerrez-Perez of 3700 Stauss Avenue, Oroville, California, was loaded into the trailer.  PEREZ then left BIG TYME AUTO driving the white GMC Sierra with the trailer.  At approximately 2:14 PM, agents observed PEREZ arrive at JOHNSON'S RESIDENCE,

---

[2] A public-records check revealed that BIG TYME AUTO is a corporate entity registered in California under the name "Big Tyme Auto Repair Inc."  The Chief Executive Officer of this entity is Jessy JOHNSON, with a mailing address at JOHNSON'S RESIDENCE.  Jose MENDOZA is listed as the corporation's Assistant Secretary.

AFFIDAVIT

6

drive in the rear gate of the property and go out of view.

g. Shortly after PEREZ left BIG TYME AUTO, MENDOZA left the same location driving MENDOZA'S VEHICLE.  At approximately 1:35 PM, MENDOZA arrived at the LASSITER WAREHOUSE, entered through a west-side man door, then opened a roll up garage door.  MENDOZA then entered the roll up door and rolled down the door.

h. At approximately 4:15 PM, MENDOZA left the LASSITER WAREHOUSE in MENDOZA'S VEHICLE.  At approximately 4:30 PM, I observed MENDOZA arrive at the Turlock Post Office in his vehicle.  MENDOZA entered the post office with a tote bag and two USPS Priority Mail medium flat rate boxes and dropped the parcels in the same location in the retail lobby observed previously.  I physically reviewed these parcels and observed nine parcels with similar counterfeit postage labels as the previously seized parcels and selected one parcel for further investigation.  On October 2, 2025, I obtained a federal search warrant for the parcel intercepted on September 25, 2025.  Inside this parcel I discovered approximately 397 grams of suspected methamphetamine (in the form of suspected counterfeit Adderall pills).

**B.    Agents use a Confidential Informant to discover "Montana's Shop," an online chatroom used by the MENDOZA DTO to arrange drug deals.**

15.    During the month of October 2025, a federal USPIS Task Force Officer (TFO) learned of the existence of an online chatroom, hosted on an encrypted messaging platform, named "TonyMontana611" or "Montana's Shop."  The information about the chatroom was provided by a Confidential Informant (CI-1), who was recruited by this TFO.[3]  During questioning, CI-1 provided substantial information about how the "Montana's Shop"

---

[3] Cooperating Informant, herein after referred to as CI-1, is currently facing drug trafficking charges for possession and distribution of cocaine, as well as possessing a firearm during and in relation to a drug trafficking crime after a large quantity of cocaine was seized from CI-1's residence. CI-1 provided information to law enforcement for potential consideration on his/her pending charges; however, CI-1 has not been given any promises by the government regarding the resolution of his/her case. CI-1's criminal history consists of 2013 conviction of Operating While Under the Influence – 1st Offense.  In 2014, CI-1 was convicted of Operating While Under the Influence – 2nd Offense and Possession of a Controlled Substance, Marijuana – 1st Offense. In 2015, CI-1 was convicted of Driving While License Suspended or Revoked. In 2017, CI-1 was convicted of Possession of Controlled Substance 1st Offense – Possession of Other Schedule I, II Substance.

AFFIDAVIT

7

chatroom worked.

a. CI-1 stated that they have been receiving bulk quantities of drugs via U.S. Mail since 2015. CI-1 also stated that they had previously purchased controlled substances via an online chatroom hosted on the encrypted messaging application Potato Chat starting in 2025. CI-1 stated that the individual they purchased these controlled substances through used the Potato Chat Username "@TonyMontana611" and the Potato Chat nickname "Tony Montana." CI-1 stated that the chatroom they had purchased the drugs through was named "Montanas Shop" or "TonyMontana611" (hereinafter "Montana's Shop"). Based on my training and experience, I believe that the name Tony Montana is likely a reference to the theatrical film "Scarface," the main character of which is a cocaine dealer and drug lord named Tony Montana.

b. Using CI-1's cellular phone, the TFO was able to inspect information posted by individuals who had access to Montana's Shop. Through this inspection, the TFO learned that a main function of the chatroom was to arrange the sale and distribution of controlled substances. One portion of the chatroom was used to post a "menu" of controlled substances that were available for sale at a given time. These substances included "PURE COLOMBIAN COCAINE", "PURE CLEAN METH", "MOLLY / MDMA", "XTC" (indicating ecstasy), "KETAMINE," and other drugs.



AFFIDAVIT

8

Photos of the drug menu in the "Montana's Shop" chatroom

c.  Pictures were also attached to the online menu, with a paper in each picture showing "TonyMontana611" and a date (presumably the date on which the picture was taken). The pictures showed packages of processed marijuana, sealed cocaine bricks stamped with the letters "K R," tablets of LSD, ketamine, Farmapram, and ecstasy. From my training and experience, drug traffickers typically take pictures and record videos using cellular devices to show potential customers. I recognized these photos to be taken digitally, potentially via a cell phone.

d.  CI-1 stated that they had purchased drugs via the Montana's Shop chatroom on multiple occasions.  CI-1 stated that they sometimes purchased drugs "insured," which they explained was an option for the purchase such that, if the purchased drugs did not make it to the destination, the vendor would reship half of the order for free.  CI-1 stated that, except for a package that had been intercepted by law enforcement, all of the packages that they had ordered via Montana's Shop had arrived with the correct controlled substances inside.

16.  The information provided by CI-1 linked the Montana's Shop chatroom to the MENDOZA DTO.  Specifically, CI-1 stated that they had been instructed to ship cash to Postal Mail Box #377 at the Merced UPS Store, MENDOZA'S UPS STORE BOX. During surveillance of the MENDOZA DTO, agents have repeatedly observed MENDOZA visit the Merced UPS Store and retrieve packages.  As detailed below, this link was confirmed during a controlled purchase of methamphetamine from the MENDOZA DTO.

a.  CI-1 stated that the vendor had instructed CI-1 to pay for some of their purchases by shipping a parcel containing cash to a specified location.  CI-1 showed the TFO a receipt for such a shipment.  The location that the vendor had specified was MENDOZA'S UPS STORE BOX MENDOZA'S UPS STORE BOX.  Based on observations made during this investigation, I know that to be an address used by the MENDOZA DTO.

b.  Between October 2025, and February 2026, DEA and METRO Agents have observed

AFFIDAVIT

9

MENDOZA drive MENDOZA'S VEHICLE to the Merced UPS Store, retrieve packages suspected to contain cash payments from drug buyers, and then drive to BIG TYME AUTO.

    c. As of June 2, 2026, MENDOZA'S UPS STORE BOX is still registered to Joseph Selph.

**C.**     **Controlled Buys from the MENDOZA DTO Using CI-1**

17. In December 2025, at the instruction of the TFO, CI-1 used the Montana's Shop chatroom to arrange a controlled purchase of crystal methamphetamine. Once the price and shipping addresses had been negotiated, agents placed the specified amount of cash in a parcel and sent it to MENDOZA'S UPS STORE BOX. Shortly after the MENDOZA DTO was given tracking information for the cash, the MENDOZA DTO provided tracking information for a parcel sent to an address provided by CI-1. When agents seized that parcel, they found that it contained the quantity and type of drugs that they had purchased.

    a. Under the direction and supervision of the TFO, CI-1 used their pre-existing Potato Chat account and username to communicate with the MENDOZA DTO via the Montanas Shop chatroom. CI-1 specified a location that the methamphetamine was to be mailed to. The vendor instructed CI-1 to provide payment for the drugs by mailing an envelope containing a specified amount of cash to "Justin S., 3144 G Street STE 125, PMB #377, Merced, CA 953240" (MENDOZA'S UPS STORE BOX). This address is for a location and private mail box (PMB) hosted inside a UPS store. This location and PMB have been previously identified during the course of this investigation via vehicle tracker data and physical surveillance, as being a common pickup location for the MENDOZA DTO.

    b. Later that month, CI-1 was notified via the chatroom that the methamphetamine had been placed in the mail. The member of the MENDOZA DTO coordinating the transaction provided CI-1 with tracking information for the parcel containing the drugs. The TFO placed the cash payment in the mail and CI-1 notified the MENDOZA DTO that it was enroute. The MENDOZA DTO provided a tracking number which indicated that the requested quantity of crystal methamphetamine had been shipped to the law enforcement-controlled address from South Gate, California.

AFFIDAVIT

10

c. Law enforcement agents were able to use the tracking information provided by the MENDOZA DTO to locate and seize the package. This package contained three clear plastic bags containing a white crystalline substance. A field drug test indicated a positive return of methamphetamine.

d. CI-1 informed the MENDOZA DTO via the MENDOZA DTO chatroom that the package containing the payment had arrived at the Merced UPS store. When the Merced UPS Store opened next, vehicle tracker information from MENDOZA'S VEHICLE showed that the vehicle went to the parking lot nearest the Merced UPS store and remained there for approximately five minutes. MENDOZA'S VEHICLE then travelled to the LASSITER WAREHOUSE, where agents observed MENDOZA enter the warehouse with a backpack. Minutes later, MENDOZA exited the LASSITER WAREHOUSE, opened MENDOZA'S VEHICLE, and then reentered the LASSITER WAREHOUSE. Based on this evidence, I believe that MENDOZA, acting as part of the MENDOZA DTO, picked up the cash payment that had been provided in exchange for the three pounds of crystal methamphetamine.

18. During January 2026, CI-1, acting under the direction and supervision of the TFO, used the same chatroom to arrange an additional controlled purchase of cocaine. Through a combination of surveillance techniques, agents observed MENDOZA leave the LASSITER WAREHOUSE with the cocaine and drop the parcel off at the Ceres Post Office.

a. The MENDOZA DTO provided a cryptocurrency wallet address, bc1q2pkp0dfz8rq9fe7hggknsqhyx9f0w61dqyrq3c, for the cryptocurrency to purchase the cocaine to be sent to. Agents then transferred the purchase price of the cocaine, in Bitcoin, to the cryptocurrency wallet address provided by the MENDOZA DTO. After receiving the cryptocurrency, the online chatroom sent a photograph of a shipping label, indicating that the cocaine had been shipped to the address provided by CI-1.

b. The same day as this second controlled purchase occurred, agents observed MENDOZA'S VEHICLE depart the LASSITER WAREHOUSE. Vehicle tracker data indicated that MENDOZA'S VEHICLE travelled unstopped to the Ceres Post Office. I

AFFIDAVIT

11

reviewed CCTV video at the Ceres Post Office and observed MENDOZA arrive at the Ceres Post Office with packages. A review of the packages dropped off at the Ceres Post Office by MENDOZA showed a package with a shipping label and tracking number that matched what the MENDOZA online chatroom had sent during the controlled purchase.

c. Once this package arrived in the city provided by CI-1 during the controlled purchase, agents located and took custody of the package. Inside of this package was a brick-like substance of cocaine. A field test of the substance came back positive for cocaine.

**D.     Financial investigation reveals the coordinated use of entities, bank accounts, and assets to conceal and integrate the MENDOZA DTO's illicit proceeds.**

19.     As the above investigation revealed the scope of the MENDOZA DTO, agents investigated the financial relationship between the MENDOZA DTO and various corporate entities. This investigation, which has included a review of bank records, escrow files, the blockchain, and related financial documentation, reveals a coordinated scheme by members of the MENDOZA DTO to convert the illicit proceeds gained through their criminal activity into assets and funds designed to appear legitimate.  This structure was carried out through multiple entities, including BIG TYME AUTO, an entity formed and controlled by JOHNSON, as well as J.J. Properties Inc., J.J. Consulting and Advertising Inc., and RE Management LLC, each associated with and controlled by JOHNSON. Corporate filings and bank account records reflect that these entities shared a common address in the JOHNSON'S RESIDENCE, demonstrating that they functioned as part of a coordinated structure rather than independent or even legitimate businesses.

20.     Within this structure and through the controlled purchases discussed above, agents learned that the MENDOZA DTO's drug proceeds were generated in the form of both cash and cryptocurrency.  Transactions over approximately $5,000 were typically conducted in cash, while smaller transactions were conducted using cryptocurrency.

a. Blockchain analysis and cryptocurrency exchange records show that, for drug sales in exchange for cryptocurrency, new cryptocurrency wallet addresses were typically generated for the buyer to deposit their funds.  Once the funds were deposited into the wallet address, members of the MENDOZA DTO with access to the wallet addresses

AFFIDAVIT

12

then transferred and consolidated the cryptocurrency into downstream wallets under the control of MENDOZA DTO.  While the cryptocurrency was being routed from these wallet addresses to intermediary and final destination wallets, it was moved through peel chains and related cyber tools designed to obscure transaction flows, ultimately aggregating into wallets associated with the MENDOZA DTO at hosted cryptocurrency exchanges including Binance, Coinbase, and ChangeNow.  Some of these intermediary and final-destination wallets were created during the month of December 2024.

b. Cash proceeds were primarily deposited into bank accounts maintained by J.J. Consulting and Advertising Inc. and BIG TYME AUTO, totaling over $300,000 since early 2025, when the members of the MENDOZA DTO seemingly started their chat room and associated drug sales.  Bank records further show that, in many instances, cash deposited into accounts held by J.J. Consulting and Advertising Inc. and BIG TYME AUTO were transferred and aggregated into bank accounts maintained in the names of other entities controlled by JOHNSON, including J.J. Properties Inc. and RE Management LLC, as well as JOHNSON'S personal bank accounts at Wells Fargo.

### IV.    CASE TAKEDOWN MARCH 26, 2026

21.    On March 26, 2026, law enforcement executed multiple federal search warrants at target locations associated with the MENDOZA DTO including: the LASSITER WAREHOUSE, MENDOZA's RESIDENCE, JOHNSON'S RESIDENCE, and BIG TYME AUTO.  At these locations law enforcement discovered the following: approximately 41 kilograms of suspected cocaine, approximately 51 kilograms of suspected ecstasy, approximately 11 kilograms of suspected ketamine, approximately 2 kilograms of suspected LSD tabs, approximately 192 kilograms of suspected methamphetamine (in the form of counterfeit Adderall pills), approximately 43 kilograms of suspected THC vapes, over $230,000.00 in US Currency, and two firearms.

22.    At the BIG TYME AUTO location, US Currency was located near a money counter and several USPS Priority Mail parcels addressed to Justin Selph at MENDOZA'S UPS STORE BOX.

23.    As part of the takedown operation, agents obtained a federal search warrant for PMB 377.

Due to personnel and time limitations, agents did not execute that search warrant.

## V.    TARGET LOCATION

### A.    MENDOZA'S UPS STORE BOX

24.    As detailed above, the MENDOZA DTO directed CI-1 to send cash payments to the UPS Store Private Mail Box (PMB) number 377 located at the UPS Store located at 3144 G Street, Merced, California 95340.  MENDOZA has visited this location on multiple locations and retrieved multiple boxes before traveling directly to either the LASSITER WAREHOUSE or BIG TYME AUTO.

25.    A check of USPS business records shows that this box was rented to a "Justin Selph".  A check of DMV records indicates Justin Selph is a real person, but Selph has not been identified in any other way relative to this case.[4]  The records provided by the Merced UPS Store show that ID documents for Justin Selph were used to apply for and open the box.

26.    On June 2, 2026, I conducted a further check of USPS business records and confirmed the box is still open and rented to Justin Selph.

## VI.    COMMON CHARACTERISTICS OF DRUG TRAFFICKERS AND THEIR DRUG TRAFFICKING ACTIVITIES

27.    Based on my training, experience, and conversations with other law enforcement officers, I know that persons engaged in the smuggling and distribution of controlled substances maintain the fruits, instrumentalities, and evidence of their criminal activities at their residences, in their vehicles, and in other locations under their control.  These items include travel records, shipping and mailing documents, financial records, discarded packaging or packaging materials, personal address/telephone books, U.S. currency, drug use paraphernalia, photographs, and cellular telephones.  Persons engaged in drug smuggling and trafficking commonly maintain addresses or telephone numbers in books, papers, or electronic storage media which reflect names, addresses, and/or telephone numbers of their suppliers, associates, partners, or customers.

28.    Based on my training, experience, and conversations with other law enforcement officers,

---

[4] I know from my training and experience that individuals engaged in drug trafficking will often try to disguise their illegal activity in an effort to avoid law enforcement detection and identification. This can include registering a Private Mail Box in the name of another real individual, or in the name of an entirely fictitious individual.

AFFIDAVIT

14

I know that drug traffickers will typically meet in person, for short durations, and typically in locations hidden from view of the public and/or surveilling law enforcement. Oftentimes, such meetings will occur at the respective house of the drug trafficker and/or co-conspirator, or in an area requiring a unique access code, such as a personal storage unit facility.

29.     Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers generally pay one another in cash for the purchase of or sale of controlled substances.  I know that drug traffickers will also use mobile banking applications, such as CashApp and Venmo, wire transfers, and other forms of payment for their drug transactions, in an attempt to conceal the transfers of currency and to avoid suspicion and detection by law enforcement.  Furthermore, I know that by using mobile banking applications, drug traffickers can transfer currency between one another without having to physically enter a bank and subjecting themselves to being captured on surveillance video or being required to produce identification.

30.     Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers also use cellular telephones and other electronic communication devices to communicate with other co-conspirators about methods and places of delivery, the types and quantities of drugs involved in a particular transaction, and to alert other traffickers or co-conspirators about the presence of law enforcement.

31.     Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers, as well as criminal co-conspirators, will often possess and use more than one phone or phone number to communicate with one another, either by voice or text message. I know that drug traffickers, as well as criminal co-conspirators will often subscribe the account under another's name, a moniker, or a fictitious name to avoid detection by law enforcement.

32.     Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers also often possess papers, letters, billings, documents, and other writings which show ownership, dominion, and control of their residence and/or vehicle.  These documents may be in paper or electronic format and may be stored in electronic devices such as a cell phone.

33.     Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers attempt to hide or conceal the source of their proceeds.  Drug traffickers

AFFIDAVIT

15

may hide caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from engaging in drug trafficking activities.  Further, drug traffickers often attempt to legitimize their profits.  To do so, traffickers may utilize domestic banks and their attendant services, securities, cashier's checks, safe deposit boxes, money drafts, letter of credit, brokerage houses, real estate, shell operations, and business fronts.  Persons involved in drug trafficking and/or money laundering keep papers relating to these activities for future reference.  Narcotic traffickers often keep large amounts of U.S. currency in order to maintain and finance their ongoing drug business.

34.    It is common for drug dealers to also be users of their product, and it is common for the drug user to keep paraphernalia, such as syringes, pipes, spoons, containers, straws, razor blades, and other items which are associated with the use of controlled substances.  Drug dealers also commonly possess paraphernalia associated with the manufacture and sale of controlled substances, such as scales, sifters, containers, cutting agents and packaging materials.  Drug traffickers also commonly possess firearms and other weapons which are used to protect and secure a drug trafficker's property.

35.    Based on my experience, evidence of drug trafficking, such as the items described above, is likely to be found where the drug dealers reside, even absent direct evidence of criminal activity at the residence.  Additionally, I know that drug dealers sometimes attempt to insulate themselves from detection by law enforcement by utilizing separate addresses from their actual residence to store illegal drugs and currency derivative of their drug trafficking.

//
//
//
//
//
//
//
//

AFFIDAVIT

16

## VII.    AUTHORIZATION REQUEST

36.    Based on the foregoing, I submit there is probable cause to believe that MENDOZA, JOHNSON, PEREZ, and others, are engaged in conspiracy to distribute and possess with intent to distribute controlled substances, and money laundering.  There is probable cause to search the location described in Attachments A, incorporated here by reference, for evidence that MENDOZA, JOHNSON, PEREZ, and other known or unknown members of the MENDOZA DTO have committed or are committing a violation of the TARGET OFFENSES.  I therefore respectfully request that the Court issue a warrant authorizing the search of the TARGET LOCATION, as set forth in the affidavit and attachments, and authorize seizure of evidence, fruits and instrumentalities of the TARGET OFFENSES, as more specifically described in Attachment B.

Respectfully submitted,

/s/
Jedediah Tyler
Postal Inspector
U.S. Postal Inspection Service

Subscribed and sworn to telephonically on:

June 4, 2026

Hon. Carolyn K. Delaney
U.S. MAGISTRATE JUDGE

/s/ Charles Campbell
Approved as to form by AUSA CHARLES CAMPBELL

AFFIDAVIT

17

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to the search of the premises known as MENDOZA'S UPS STORE BOX, 3144 G Street Suite 125, PMB 377, Merced, California 95340.  MENDOZA's UPS STORE BOX is located in a shopping center on the northeast corner of the intersection of G Street and East Olive Avenue. MENDOZA'S UPS STORE BOX is further described as Private Mail Box (PMB) 377, found at the Merced UPS Store, and includes any items which addressed to the same which are too large to fit in the private mail box.  The numbers "377" are affixed to the front of the private mail box, which appear similar to several common USPS Post Office Boxes.

A picture of MENDOZA'S UPS STORE BOX is depicted below:



**ATTACHMENT B**

**Property to be Seized**

This warrant authorizes the government to search for the following items, which constitute evidence, fruits, proceeds, and instrumentalities of violations of 21 U.S.C. § 846 and/or 18 U.S.C. § 1956(a)(1):

1) Narcotics or other controlled substances or controlled substance analogue distribution, manufacturing, and conversion paraphernalia, including weighing instruments, cutting agents, packaging materials, and chemicals;

2) Drug packaging, baggies, and cutting agents, including items used to conceal the odor of narcotics, such as perfumes, coffee, dryer sheets, tobacco, or other substances with a strong odor;

3) Documents and items demonstrating the possession, importation, exportation and/or distribution of controlled substances or controlled substance analogues and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, envelopes, and packaging materials;

4) Cash, financial instruments, crypto currency, cold storage wallets, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances or controlled substance analogues; as well as evidence of ownership of real estate, vehicles, and businesses;

5) Books, receipts, notes, ledgers, and other forms of records evidencing drug distribution activities, including "pay/owe sheets";

6) Firearms and ammunition, including but not limited to, handguns, pistols, revolvers, and other weapons; as well as any records or receipts pertaining to firearms and ammunition;

7) Items of personal property that tend to identify the person in occupancy, control, or ownership of the places being searched, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and

telephone bills, tax documentation, travel documents, statements, passports, driver's license and/or identification cards, immigration documentation, birth certificates, and keys;

8)  Keys belonging to and/or evidence of the existence and usage of any lockers, safe deposit boxes, storage facility, vehicles, or other property;

9)  Computers, digital devices, or electronic storage mediums capable of being used to commit, further, or store evidence or fruits of the offenses listed above;

10) Any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or other electronic devices stored above, including physical keys, encryption devices, physical dongles, and other similar pieces of information or physical devices that are necessary to gain access to the computer equipment, storage devices, or data;

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| PMB 377 AT UPS STORE AT 3144 G STREET, MERCED, CA 95340, | ) ) ) ) | Case No. |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____June 18, 2026_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐  Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐   for   30   days *(not to exceed 30)*  ☐   until, the facts justifying, the later specific date of _____ .

Date and time issued:      June 4, 2026 at 1:19 pm          _____
                                                                                *Judge's signature*

City and state:      Sacramento, California          Carolyn K. Delaney, U.S. Magistrate Judge
                                                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____   _____
Signature of Judge                                                              Date

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to the search of the premises known as MENDOZA'S UPS STORE

BOX, 3144 G Street Suite 125, PMB 377, Merced, California 95340.  MENDOZA's UPS

STORE BOX is located in a shopping center on the northeast corner of the intersection of G

Street and East Olive Avenue. MENDOZA'S UPS STORE BOX is further described as Private

Mail Box (PMB) 377, found at the Merced UPS Store, and includes any items which addressed

to the same which are too large to fit in the private mail box.  The numbers "377" are affixed to

the front of the private mail box, which appear similar to several common USPS Post Office

Boxes.

A picture of MENDOZA'S UPS STORE BOX is depicted below:



## ATTACHMENT B

### Property to be Seized

This warrant authorizes the government to search for the following items, which constitute evidence, fruits, proceeds, and instrumentalities of violations of 21 U.S.C. § 846 and/or 18 U.S.C. § 1956(a)(1):

1) Narcotics or other controlled substances or controlled substance analogue distribution, manufacturing, and conversion paraphernalia, including weighing instruments, cutting agents, packaging materials, and chemicals;

2) Drug packaging, baggies, and cutting agents, including items used to conceal the odor of narcotics, such as perfumes, coffee, dryer sheets, tobacco, or other substances with a strong odor;

3) Documents and items demonstrating the possession, importation, exportation and/or distribution of controlled substances or controlled substance analogues and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, envelopes, and packaging materials;

4) Cash, financial instruments, crypto currency, cold storage wallets, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances or controlled substance analogues; as well as evidence of ownership of real estate, vehicles, and businesses;

5) Books, receipts, notes, ledgers, and other forms of records evidencing drug distribution activities, including "pay/owe sheets";

6) Firearms and ammunition, including but not limited to, handguns, pistols, revolvers, and other weapons; as well as any records or receipts pertaining to firearms and ammunition;

7) Items of personal property that tend to identify the person in occupancy, control, or ownership of the places being searched, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and

telephone bills, tax documentation, travel documents, statements, passports, driver's license and/or identification cards, immigration documentation, birth certificates, and keys;

8) Keys belonging to and/or evidence of the existence and usage of any lockers, safe deposit boxes, storage facility, vehicles, or other property;

9) Computers, digital devices, or electronic storage mediums capable of being used to commit, further, or store evidence or fruits of the offenses listed above;

10) Any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or other electronic devices stored above, including physical keys, encryption devices, physical dongles, and other similar pieces of information or physical devices that are necessary to gain access to the computer equipment, storage devices, or data;

# Exhibit 1

ERIC GRANT
United States Attorney
CHARLES CAMPBELL
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of:<br><br>2721 LASSITER LANE, TURLOCK,<br>CALIFORNIA 95380 | CASE NO.<br><br>AFFIDAVIT IN SUPPORT OF AN APPLICATION<br>FOR SEARCH WARRANTS<br><br>**UNDER SEAL** |

I, Jedediah Tyler, being first duly sworn, hereby depose and state as follows:

## I.    AGENT BACKGROUND

1.    I am a Postal Inspector with the United States Postal Inspection Service (USPIS), currently assigned to the Stockton, California domicile. I investigate criminal violations of federal and state law, including illegal narcotics, firearms, and illicit proceeds being sent through the U.S. Mail; money laundering; robbery and burglary of postal employees and facilities; destruction of government property; theft/possession of stolen U.S. Mail; mail and bank fraud; and identity theft crimes. I am a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure; that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

2.    I have been a Postal Inspector since January 2020. I am currently assigned to the Stockton Domicile, San Francisco Division, of the United States Postal Inspection Service. In addition, I am also assigned as an Agent with the San Joaquin County Metropolitan Narcotics Task Force. During

AFFIDAVIT

1

my tenure, I completed training at the United States Postal Inspection Service Basic Inspector Training in Potomac, MD.  I have completed the USPIS Basic Contraband Interdiction & Investigation course. As part of my official duties, it is my responsibility to investigate violations of federal and state law, including robbery and burglary of postal facilities, destruction of government property, theft of U.S. Mail, possession of stolen U.S. Mail, mail and bank fraud, credit card fraud, identify theft, and unlawful transportation of contraband, including firearms, controlled substances, and proceeds of the sale of controlled substances through the U.S. Mail.  Through my training, experience, and interaction with other experienced Postal Inspectors and other drug trafficking investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs; to collect and conceal drug-related proceeds; to communicate with other participants to accomplish such objectives; and to use the mail to conduct their illegal operations.

3.      Based on my training and experience, I know that drug traffickers use their vehicles to store and transport narcotics and other contraband, often by concealing the controlled substances in hidden compartments of their vehicles. Drug traffickers also store firearms in their vehicles to protect their drug proceeds.  Drug traffickers also use their vehicles to purchase supplies of drugs, distribute drugs to customers, and collect money from their customers.  For example, drug traffickers frequently use their vehicles to drive to neutral meeting locations to meet with suppliers or customers, where drugs are exchanged for money (often inside of the drug dealer or customer's vehicle).  Thus, evidence of drug distribution can often be found in a trafficker's vehicle.

4.      In addition to my personal knowledge, this affidavit is based on (1) information I obtained from related investigations; (2) conversations with other law enforcement officers including oral and written investigative and laboratory reports that I received directly or indirectly from other law enforcement officials; (3) review and analysis of information received from various sources, including evidence provided pursuant to subpoenas and search warrants, such as GPS tracking data; (4) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (5) a review of public records, telephone toll records, and subscriber information; (6) information provided from confidential sources of information and other sources of information working with law enforcement agencies; (7) a review of driver's license and automobile registration records; (8) records

AFFIDAVIT

2

from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (9) my training and experience as a Postal Inspector and/or; (10) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

5.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## II.    INTRODUCTION

6.    As discussed in further detail below, MENDOZA, JOHNSON, and PEREZ are members of a drug trafficking organization (the MENDOZA DTO) that is distributing large quantities of controlled substances throughout the United States, primarily using the U.S. Mail.

7.    Agents have intercepted and searched more than a dozen packages shipped through the U.S. Mail by the MENDOZA DTO, which together have contained cocaine, ketamine, methamphetamine, psilocybin mushrooms, marijuana, LSD, and MDMA.  During the same period, the MENDOZA DTO is believed to have shipped more than 1,000 parcels which were not intercepted.

8.    The MENDOZA DTO uses a warehouse in Turlock, California as its main logistical hub (the LASSITER WAREHOUSE).  This warehouse is located in Stanislaus County, in the State and Eastern District of California.  Agents have observed MENDOZA, JOHNSON, and PEREZ frequently coming and going from the LASSITER WAREHOUSE, using keys to lock and unlock the warehouse doors, and carrying packages in and out.

9.    The MENDOZA DTO uses multiple online platforms to find buyers for controlled substances.  As part of this process, the MENDOZA DTO uses chatrooms on the encrypted messaging application Signals and Potato Chat.  The DTO uses these chatrooms to arrange and facilitate narcotics transactions.  In those chatrooms, members of the DTO regularly post a "menu" of drugs which the DTO has available for purchase, along with prices, shipping information, and methods of payment.  The

AFFIDAVIT

3

DTO even offers buyers the opportunity to purchase a form of shipping insurance: for an extra $1,000, if the shipment of drugs does not reach the buyer, then the DTO will provide a partial replacement for free.

10. When a buyer makes a purchase, a member of the DTO communicates with the buyer via the Signal and Potato Chat applications to finalize the deal. The buyer is then given instructions on how to provide payment, which usually takes place either via a transfer of cryptocurrency or by shipping parcels containing cash to UPS boxes that the DTO controls. If payment is provided in cash, a member of the MENDOZA DTO will pick up the cash from the UPS box, and often the cash is then transported to an auto repair business owned by JOHNSON, Big Tyme Auto (BIG TYME AUTO).

11. Once a deal has been struck, members of the MENDOZA DTO will portion and package the controlled substances so that it is ready to be shipped through the U.S. Mail. This process often includes the use of counterfeit mailing labels. A member of the DTO will then take labeled outgoing parcels to one of several nearby U.S. Post Offices and drop them off for shipment. Agents have on several occasions observed MENDOZA dropping off groups of between fifteen and thirty parcels that are believed to contain controlled substances shipped by the MENDOZA DTO.

12. After receiving payment for the drugs, the MENDOZA DTO uses several methods to launder the funds and make them appear legitimate. These methods included the use of multiple business entities, including BIG TYME AUTO. Cash from the MENDOZA DTO's drug sales was routinely transferred and aggregated into accounts controlled by these business entities, and then used to fund the activities of the DTO and to acquire assets, including real estate and vehicles for DTO members. Some of those vehicles were then resold, further laundering the drug proceeds.

13. Based on my training and experience, I believe there is probable cause that MENDOZA, JOHNSON, and PEREZ are engaged in a conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846(a); possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); illegal use of the mails in furtherance of narcotics trafficking, in violation of 21 U.S.C. § 843(b); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

14. This affidavit is made in support of search warrants for the following persons and property associated with the MENDOZA DTO:

a. The premises located at 2721 Lassiter Lane, Turlock, California 95380 (the LASSITER

AFFIDAVIT

4

WAREHOUSE), more fully described in Attachment A-1;

b.  The person of Jose MENDOZA, more fully described in Attachment A-2;

c.  The cellular telephone assigned call number (707) 972-1252 ("MENDOZA's Cell Phone"), believed to be used by MENDOZA, and any cellular telephone located on MENDOZA's person or under his control at the time of his arrest or contact with law enforcement, more fully described in Attachment A-3;

d.  The residence located at 2851 Oleander Avenue, Merced, California 95340 ("MENDOZA'S RESIDENCE"), more fully described in Attachment A-4;

e.  The vehicle described as a white GMC Sierra, bearing California License Plate number 68354X3 ("MENDOZA'S VEHICLE"), more fully described in Attachment A-5;

f.  The UPS Store Private Mail Box (PMB) number 377 at the UPS Store located at 3144 G Street, Merced, California 95340 ("MENDOZA's UPS STORE BOX"), more fully described in Attachment A-6;

g.  The person of Jessy JOHNSON, more fully described in Attachment A-6;

h.  The cellular telephone assigned call number (925) 667-5587 ("JOHNSON'S CELL PHONE"), and any cellular telephone located on JOHNSON's person or under his control at the time of his arrest or contact with law enforcement, more fully described in Attachment A-8;

i.  The residence located at 2101 East Linwood Avenue, Turlock, California 95380 (the "JOHNSON Residence"), more fully described in Attachment A-9;

j.  The vehicle described as a grey GMC Sierra bearing California License Plate 26287F4 ("JOHNSON's Vehicle"), more fully described in Attachment A-10;

k.  The person of Alejandro PEREZ, more fully described in Attachment A-11;

l.  The cellular telephone assigned call number (209) 570-4642 ("PEREZ's Cell Phone"), and any cellular telephone located on PEREZ's person or under his control at the time of his arrest or contact with law enforcement, more fully described in Attachment A-12;

m.  The vehicle described as a silver Toyota RAV4, with California License Plate 7FEF973 ("PEREZ'S VEHICLE"), more fully described in Attachment A-13;

AFFIDAVIT

5

n. The business located at 1104 East Childs Avenue, Merced, California 95341 ("Big Tyme Auto"), more fully described in Attachment A-14;

15. The search warrants seek to search the above persons and properties, collectively referred to as the "TARGET LOCATIONS," for evidence, instrumentalities, contraband, and fruits of: conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846(a); possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); illegal use of the mails in furtherance of narcotics trafficking, in violation of 21 U.S.C. § 843(b); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); collectively referred to as the TARGET OFFENSES, as more fully described in Attachment B.

### III.    PROBABLE CAUSE

#### A.    Investigators catch MENDOZA mailing drugs from multiple Post Offices in the Central Valley, and identify the LASSITER WAREHOUSE as a potential stash location.

16. On April 24, 2025, San Joaquin County Metropolitan Narcotics Task Force (METRO) agents, with assistance from San Joaquin County Sheriff's Department SWAT team, executed a State of California residential search warrant at 2020 Fulkerth Road, Turlock, California 95380, related to an ongoing narcotics investigation. Inside the residence, agents discovered various quantities of cocaine, MDMA, Adderall pills, ecstasy pills, LSD tabs, and U.S. Currency. In addition, agents found USPS shipping supplies, USPS shipping receipts, and various typed and handwritten notes consistent with drug trafficking. The notes included names, addresses, and notations which, based on my training and experience, indicated weights and/or quantities of drugs. Based on my training and experience, the combination of USPS shipping supplies and the typed and handwritten notes, along with the drugs discovered in the residence, are consistent with drug distribution through the U.S. Mail. The notes appear to include shipping information for downstream drug customers. The notes appeared to identify intended recipient with addresses in: Topsham, Maine; Boise, Idaho; and North Bergen, New Jersey.

17. Following the execution of this search warrant, I identified three parcels that were being shipped from the Eastern District of California to addresses on the recipient list found in the Fulkerth Road residence. When those parcels were searched, Postal Inspectors collectively found more than 4 kg of suspected cocaine, suspected counterfeit Adderall pills, and suspected ketamine.

AFFIDAVIT

6

a. I identified a parcel that had been shipped to the listed address in Topsham, Maine, on April 22, 2025. On April 25, 2025, this parcel was intercepted and shipped back to California. On May 5, 2025, I obtained a federal search warrant for the parcel. Inside the parcel law enforcement discovered approximately 1,006.6 grams of suspected cocaine in a kilogram brick, and approximately 5.6 grams of suspected counterfeit Adderall pills.

b. On July 5, 2025, I identified a parcel that had been shipped via the U.S. Mail to the listed address in Boise, Idaho. On July 7, 2025, the Boise, Idaho parcel was intercepted by a Postal Inspector. On July 10, 2025, the Postal Inspector obtained a federal search warrant for this new parcel. Inside this parcel law enforcement discovered 255 grams of suspected cocaine, and 69 grams of suspected ketamine.

c. On August 1, 2025, I identified a parcel which had been shipped via the U.S. Mail to the listed address in North Bergen, New Jersey. I conducted a further electronic check of USPS business records for this parcel and found it had been shipped out of Turlock, California on July 30, 2025. I requested that USPIS personnel in New Jersey intercept this parcel and send it to the Stockton Domicile. On August 9, 2025, the parcel addressed North Bergen, New Jersey, was received at the Stockton Domicile of the USPIS. On August 15, 2025, I obtained a federal search warrant for this parcel. Inside this parcel I discovered 3,117.8 grams of suspected cocaine.

18. During a comparison of the labels of the above parcels, I noticed the postage for one of the parcels was not paid for at a retail counter. The postage appeared similar to postage generated electronically by postal customers. USPS offers one type of this electronically generated postage, which is known as "Click N Ship," and is available to be purchased from USPS.com. However, certain characteristics typically found on those electronically generated postage labels were absent from the second parcel, specifically, any information which would link the payment account or date shipped. Additionally, the parcel tracking number begins with "95." Only postage labels generated at USPS retail counters are assigned tracking numbers beginning with "95." Based on my training and experience, and the above characteristics, I believe the postage for the parcel sent to Boise, Idaho, was counterfeit.

AFFIDAVIT

7

19. Over the next few weeks, I inspected packages at the Turlock Post Office to identify parcels which contained drugs. Through this investigation, I found and searched seven additional parcels, which collectively contained approximately 1,500 grams of suspected cocaine and 520 grams of suspected ketamine, as well as suspected LSD tablets, suspected processed marijuana, and other suspected THC products. By conducting surveillance, reviewing camera footage, and examining DMV records, I was able to determine that these seven packages were all delivered to the Turlock Post Office by Jose Alverto MENDOZA. A review of prior surveillance camera footage showed that MENDOZA appears to have also delivered the package containing suspected cocaine which was shipped to North Bergen.

    a. On August 4, 2025, I physically reviewed additional parcels at the Turlock Post Office, 555 East Main Street, Turlock, California 95380, to identify parcels bearing postage that appeared similar to the counterfeit postage on the parcel intercepted in Idaho. I located approximately thirty parcels that matched the same postage characteristics. I reviewed CCTV surveillance video at the Turlock Post Office and observed a heavyset Hispanic male drop off all thirty parcels in the retail lobby. Of the parcels bearing the suspected counterfeit postage, I selected three parcels for further investigation. On August 5, 2025, I obtained a federal search warrant for these three parcels. Inside the three parcels, I discovered suspected LSD tablets, suspected processed marijuana, suspected THC wax, and suspected THC vape cartridges.

    b. On August 25, 2025, I conducted a review of surveillance video at the Turlock Post Office. Surveillance video from August 1, 2025, revealed that the same subject who had dropped off the thirty parcels mentioned above also dropped off parcels on August 4, 2025. One of the parcels appeared to be similar size and shape as the parcel shipped to North Bergen, New Jersey, which had contained approximately 3 kg of suspected cocaine.

c. On August 26, 2025, METRO agents conducted further surveillance at the Turlock Post Office. At approximately 4:31 PM, agents observed a similar subject from the prior surveillance video enter and exit the post office twice while carrying parcels each time. The subject was driving a white GMC pickup truck bearing California license plate 68354X3 (MENDOZA'S VEHICLE). A law enforcement database check revealed the registered owner to be Jose Alverto MENDOZA. Agents obtained DMV information including a DMV photo of MENDOZA. During surveillance I observed a live feed of surveillance video and confirmed the subject who entered the post office matched the appearance of MENDOZA's driver license photo. I reviewed the parcels MENDOZA dropped off at the post office and found that all seventeen bore the same counterfeit postage labels as the previously identified parcels. I selected four parcels for further investigation. On August 29, 2025, I obtained federal search warrants for these four parcels. Inside these parcels I discovered 1,058 grams of suspected cocaine, 523 grams of suspected cocaine, 2,115 grams of suspected THC vape pens, and 520 grams of suspected ketamine.



Photo showing contents of a package shipped by the MENDOZA DTO containing 523 grams of a substance which field-tested positive for cocaine.

AFFIDAVIT

20. On September 2, 2025, METRO agents obtained a vehicle tracking device warrant for MENDOZA'S VEHICLE from the Honorable Judge Linda McFadden of the Stanislaus County Superior Court. METRO agents then successfully installed the vehicle tracker on MENDOZA'S VEHICLE while it was parked at 2851 Oleander Avenue, Merced, California 95340 (MENDOZA'S RESIDENCE).

21. Between September 3, 2025, and September 10, 2025, METRO agents reviewed vehicle tracking information and learned that MENDOZA'S VEHICLE also visits the U.S. Post Offices in Merced and Ceres.

22. METRO agents and I then used a combination of physical surveillance, surveillance video, and vehicle tracking information to identify 24 parcels that MENDOZA dropped off at the Post Offices in Turlock and Merced between September 11, 2025, and September 12, 2025. MENDOZA used MENDOZA'S VEHICLE to deliver all of these packages. I obtained search warrants for 4 of these parcels and found them to collectively contain approximately 400 grams of suspected methamphetamine in the form of counterfeit Adderall pills, approximately 580 grams of suspected psilocybin mushrooms, and suspected THC products.

   a. On September 11, 2025, METRO agents reviewed vehicle tracking information and learned that MENDOZA'S VEHICLE visited the Turlock Post Office between approximately 4:23 PM and 4:27 PM. I reviewed surveillance video from the Turlock Post Office and observed MENDOZA enter the post office at approximately 4:23 PM and drop off multiple parcels. Also on September 11, 2025, I conducted a physical review of these parcels at the Turlock Post Office. I observed eight parcels with similar counterfeit postage labels as the previously seized parcels and selected one parcel for further investigation.

   b. On September 12, 2025, agents conducted surveillance on MENDOZA and his vehicle which was parked at MENDOZA'S RESIDENCE. At approximately 9:39 AM, MENDOZA was observed exiting his residence and entering the driver's seat of his vehicle. MENDOZA'S VEHICLE then departed the residence. At approximately 9:44 AM, MENDOZA'S VEHICLE arrived at the Merced Post Office. I arrived at the Merced Post Office at the same time and observed live CCTV footage. At approximately

9:46 AM, I observed MENDOZA enter the post office and drop off two parcels at the retail counter. As MENDOZA exited the post office, he picked up several free empty USPS Priority Mail shipping boxes. I physically reviewed the parcels MENDOZA left at the retail counter. I observed they both bore similar counterfeit postage labels as the previously seized parcels and selected one parcel for further investigation.

    c. Also on September 12, 2025, METRO agents reviewed vehicle tracking information and learned MENDOZA'S VEHICLE visited the Turlock Post Office between approximately 3:53 PM and 3:59 PM. I reviewed surveillance video from the Turlock Post Office and observed MENDOZA enter the post office at approximately 3:56 PM and drop off multiple parcels. Also on September 12, 2025, I conducted a physical review of parcels at the Turlock Post Office. I observed fourteen parcels with similar counterfeit postage labels as the previously seized parcels and selected two parcels for further investigation.

    d. On September 18, 2025, I obtained a federal search warrant for the four parcels intercepted on September 11, 2025, and September 12, 2025. Inside these parcels I discovered 196 grams of suspected methamphetamine (in the form of suspected counterfeit Adderall pills), 3,628 grams of suspected THC vape pens, 203 grams of suspected methamphetamine (in the form of suspected counterfeit Adderall pills), and 588 grams of suspected psilocybin mushrooms.

23. Later that month, agents observed MENDOZA exiting the LASSITER WAREHOUSE carrying multiple parcels which he then dropped off at the Turlock Post Office. I searched two of those parcels and seized suspected LSD and approximately 200 grams of suspected methamphetamine (in the form of suspected counterfeit Adderall pills).

    a. On September 18, 2025, METRO agents conducted surveillance on MENDOZA and his vehicle which was parked at 2721 Lassiter Lane, Turlock, California, 95380 (the LASSITER WAREHOUSE). At approximately 4:15 PM, MENDOZA was observed exiting the LASSITER WAREHOUSE with multiple small white parcels that he placed in the rear of his vehicle. At approximately 4:16 PM, MENDOZA left the LASSITER WAREHOUSE in his vehicle. At approximately 4:30 PM, I observed MENDOZA arrive

AFFIDAVIT

11

at the Turlock Post Office. MENDOZA entered the post office with a tote bag and dropped off several small white parcels (similar to the ones observed being placed in the truck). I physically reviewed parcels at the Turlock Post Office and observed 12 parcels with similar counterfeit postage labels as the previously seized parcels and selected two parcels for further investigation.

b. On September 23, 2025, I obtained a federal search warrant for the two parcels intercepted on September 18, 2025. Inside these parcels I discovered 107.4 grams of suspected methamphetamine (in the form of suspected counterfeit Adderall pills), 106.6 grams of suspected methamphetamine (in the form of suspected counterfeit Adderall pills), and 3.8 grams of suspected LSD.

**B.      Agents identify Jessy JOHNSON and Alejandro PEREZ as members of the MENDOZA DTO.**

24.      During the September 18 surveillance of the LASSITER WAREHOUSE, agents also observed an individual later identified as Jessy JOHNSON exit the LASSITER WAREHOUSE. Physical surveillance of JOHNSON also identified JOHNSON'S VEHICLE and JOHNSON'S RESIDENCE.

a. On September 18, 2025, agents conducted a surveillance operation at the LASSITER WAREHOUSE. On that date, they observed MENDOZA'S VEHICLE parked outside the warehouse. Agents also observed a gray 2025 GMC Sierra with California license plate 26287F4 (JOHNSON'S VEHICLE) parked at the LASSITER WAREHOUSE. A check of DMV records determined that the gray GMC Sierra was registered to Jessy JOHNSON. The same records stated that JOHNSON's address was 2101 East Linwood Avenue, Turlock, California (JOHNSON'S RESIDENCE).

b. As stated above, during the September 18, 2025, surveillance of the LASSITER WAREHOUSE, agents observed MENDOZA drive from the warehouse to the Turlock Post Office to drop off a bag of parcels, at which point MENDOZA returned to the LASSITER WAREHOUSE. At approximately 5:07 PM, METRO agents observed a white male wearing a black shirt, black shorts, and a hat exit the LASSITER

AFFIDAVIT

12

WAREHOUSE.  This individual was identified as Jessy JOHNSON using DMV records. JOHNSON entered JOHNSON'S VEHICLE and drove away.  At approximately 5:18 PM, METRO agents observed JOHNSON pull into the carport at JOHNSON'S RESIDENCE and park his vehicle.  Also in the carport was a white Lexus SUV with California license plate 9TRR220, which DMV records show is registered to Araceli Mendoza-Ayala at JOHSON'S RESIDENCE.

25.    On September 25, 2025, agents saw JOHNSON, MENDOZA, and an individual later identified as Alejandro PEREZ move multiple vehicles and parcels between MENDOZA'S RESIDENCE, JOHNSON'S RESIDENCE, the LASSITER WAREHOUSE, the Merced UPS Store, and BIG TYME AUTO.  Of note, MENDOZA visited BIG TYME AUTO and the LASSITER WAREHOUSE before dropping off nine parcels at the Turlock Post Office.  I searched one of those parcels and found approximately 400 grams of suspected methamphetamine.

    a.  At approximately 7:58 AM, METRO agents observed JOHNSON at JOHNSON'S RESIDENCE, parking JOHNSON'S VEHICLE.  At approximately 9:28 AM, a METRO agent observed JOHNSON enter JOHNSON'S VEHICLE and drive away.  Agents followed JOHNSON until he arrived at the LASSITER WAREHOUSE.  JOHNSON unlocked a large gate and parked at the rear of the warehouse.

    b.  At approximately 11:28 AM, METRO agents observed MENDOZA at the MENDOZA RESIDENCE handling and taping shut a large brown box.  Agents observed MENDOZA grabbing multiple boxes and placing them on the porch of MENDOZA'S RESIDENCE.  At approximately 11:41 AM, agents observed MENDOZA exit the property and drive off in MENDOZA'S VEHICLE.

    c.  At approximately 11:45 AM, agents observed MENDOZA arrive at the UPS Store, 3144 G Street, Suite 125, Merced, California 95340 (the "Merced UPS Store").  MENDOZA entered the Merced UPS Store.  MENDOZA then exited with multiple medium-sized brown and white boxes, entered his vehicle, and left the area.

    d.  At approximately 11:56 AM, agents observed MENDOZA arrive at the business located

AFFIDAVIT

13

at 1104 East Childs Avenue, Merced, California 95341 (BIG TYME AUTO).[1]

e. At approximately 11:51 AM, METRO agents observed a white GMC Sierra bearing California license plate 33291L3, registered to Jessy JOHNSON, arrive at MENDOZA'S RESIDENCE towing a large dump trailer. At approximately 12:11 PM, agents observed the driver of the white GMC Sierra load the boxes that MENDOZA had left onto the porch into the large dump trailer. A later examination of records held by the California DMV and Homeland Security Investigations (HSI) revealed this individual to be Alejandro Felguerez PEREZ.

f. PEREZ then left MENDOZA'S RESIDENCE driving the truck and trailer. At approximately 12:42 PM, the white GMC with the trailer arrived at BIG TYME AUTO. A motorcycle bearing California license plate 24H7185, registered to Jose Antonio Felguerrez-Perez of 3700 Stauss Avenue, Oroville, California, was loaded into the trailer. PEREZ then left BIG TYME AUTO driving the white GMC Sierra with the trailer. At approximately 2:14 PM, agents observed PEREZ arrive at JOHNSON'S RESIDENCE, drive in the rear gate of the property and go out of view.

g. Shortly after PEREZ left BIG TYME AUTO, MENDOZA left the same location driving MENDOZA'S VEHICLE. At approximately 1:35 PM, MENDOZA arrived at the LASSITER WAREHOUSE, entered through a west-side man door, then opened a roll up garage door. MENDOZA then entered the roll up door and rolled down the door.

h. At approximately 4:15 PM, MENDOZA left the LASSITER WAREHOUSE in MENDOZA'S VEHICLE. At approximately 4:30 PM, I observed MENDOZA arrive at the Turlock Post Office in his vehicle. MENDOZA entered the post office with a tote bag and two USPS Priority Mail medium flat rate boxes and dropped the parcels in the same location in the retail lobby observed previously. I physically reviewed these parcels and observed nine parcels with similar counterfeit postage labels as the previously seized

---

[1] A public-records check revealed that BIG TYME AUTO is a corporate entity registered in California under the name "Big Tyme Auto Repair Inc." The Chief Executive Officer of this entity is Jessy JOHNSON, with a mailing address at JOHNSON'S RESIDENCE. Jose MENDOZA is listed as the corporation's Assistant Secretary.

AFFIDAVIT

14

parcels and selected one parcel for further investigation.  On October 2, 2025, I obtained a federal search warrant for the parcel intercepted on September 25, 2025.  Inside this parcel I discovered approximately 397 grams of suspected methamphetamine (in the form of suspected counterfeit Adderall pills).

26.   On October 1, 2025, agents obtained another federal tracker warrant for MENDOZA'S VEHICLE.  A review of the tracker information and physical surveillance confirmed that MENDOZA, JOHNSON, and PEREZ continued to visit the LASSITER WAREHOUSE, move packages in and out of the LASSITER WAREHOUSE, and drop parcels off at Post Offices and other shipping centers. Surveillance during this period also determined that MENDOZA, JOHNSON, and PEREZ all have keys that they use to access the LASSITER WAREHOUSE.

a.   On October 20, 2025, SA Borges observed PEREZ'S VEHICLE arrive at the LASSITER WAREHOUSE.  PEREZ'S VEHICLE drove around towards the back of the property. PEREZ exited the vehicle and grabbed a large box out of the cabin of the vehicle. Over the next few minutes, PEREZ made approximately six trips from PEREZ'S VEHICLE into the LASSITER WAREHOUSE, each time carrying a large box.

b.   Later that day, agents observed MENDOZA retrieve two large boxes from the LASSITER WAREHOUSE and place them into MENDOZA'S VEHICLE.  Tracker data and physical surveillance revealed that MENDOZA drove MENDOZA'S VEHICLE to a private shipping center, PostalAnnex, in Modesto, California. A review of the property's security footage, as well as an administrative subpoena served to PostalAnnex, revealed that MENDOZA dropped off two large boxes, one weighing 45 lbs. and 2.2 ounces, destined for Tuscaloosa, AL, and one weighing 33 lbs. and 7 ounces, destined for Magalia, CA.

c.   MENDOZA paid cash to ship out these packages and used a fake name of "Sergio Gomez."  FedEx security in Tuscaloosa, AL, intercepted the 45lb package that MENDOZA had shipped to that city.  An Alabama state search warrant into the package revealed approximately 15 pounds of processed marijuana concealed in a dog food container.

AFFIDAVIT

15

d.  On October 27, 2025, at approximately 11:37 AM, SA Borges observed PEREZ'S VEHICLE arrive at the LASSITER WAREHOUSE towing a large black trailer.  PEREZ exited the driver's seat of PEREZ'S VEHICLE then entered the LASSITER WAREHOUSE.  At approximately 11:44 AM, SA Borges observed PEREZ and JOHNSON exit the LASSITER WAREHOUSE.  JOHNSON and PEREZ grabbed approximately 15 large black garbage bags from the black trailer and took them inside of the LASSITER WAREHOUSE.

e.  On October 31, 2025, SA Borges observed PEREZ'S VEHICLE arrive at the LASSITER WAREHOUSE.  PEREZ exited PEREZ'S VEHICLE, retrieved a large box out of the cabin of the vehicle, and took the large box into the warehouse.

f.  On November 5, 2025, PEREZ was observed arriving at the LASSITER WAREHOUSE in PEREZ'S VEHICLE.  PEREZ entered the LASSITER WAREHOUSE, retrieved seemingly light or empty cardboard boxes from inside of the LASSITER WAREHOUSE, and loaded them into PEREZ'S VEHICLE.  PEREZ then drove away.

g.  On November 21, 2025, PEREZ arrived at the LASSITER WAREHOUSE in PEREZ'S VEHICLE. PEREZ retrieved a large cardboard box of the cab of PEREZ'S VEHICLE, unlocked the LASSITER WAREHOUSE's west-facing man door, and took the large box into the warehouse.

h.  On December 10, 2025, PEREZ arrived at the LASSITER WAREHOUSE in PEREZ'S VEHICLE.  PEREZ exited PEREZ'S VEHICLE, unlocked the man-door of the warehouse, walked back to the cabin of PEREZ'S VEHICLE, and then walked back into the warehouse.

i.  On December 11, 2025, PEREZ arrived at the LASSITER WAREHOUSE in PEREZ'S VEHICLE.  PEREZ again unlocked the man-door of the warehouse and walked into the LASSITER WAREHOUSE. PEREZ then exited the warehouse and grabbed a small bag out of the cabin of PEREZ'S VEHICLE. PEREZ made two trips from the LASSITER WAREHOUSE to PEREZ'S VEHICLE.

j.  On December 22, 2025, PEREZ arrived at the LASSITER WAREHOUSE in PEREZ'S

AFFIDAVIT

16

VEHICLE.  PEREZ opened the rear hatch and the rear passenger's side door of PEREZ'S VEHICLE. PEREZ retrieved a duffel/tote bag and a hand bag from the cabin of PEREZ'S VEHICLE. PEREZ made approximately four trips from the cabin of PEREZ'S VEHICLE to the LASSITER WAREHOUSE.

27.    PEREZ'S VEHICLE is registered to a Bryan Osbaldo Mendoza at 2855 Oleander Avenue, Merced, CA.[2]  DEA Agents have learned through surveillance that Alejandro Felguerez PEREZ frequently drives this vehicle and lives currently at 331 E. 5th Street, Crows Landing, CA (PEREZ'S RESIDENCE).

28.    Also during this period, DEA agents identified phone numbers used by the members of the MENDOZA DTO.

a.    In October 2025, intelligence analysts from the DEA found a potential cellular phone number, (707) 972-1252, for Jose Alverto MENDOZA using commercial databases, including open-source databases that track publicly provided information regarding public records, phone records, social media records, etc.[3]

b.    An administrative subpoena was submitted to VERIZON for (707) 972-1252 (MENDOZA'S CELL PHONE), which returned "Jose Alverto MENDOZA" as the listed subscriber with an address of P.O. Box 971, Boonville, California. Drug traffickers frequently attempt to conceal their identity by using false names or false addresses that do not strictly correspond to their legal identity.

c.    In October 2025, DEA agents observed MENDOZA arrive at the LASSITER WAREHOUSE. As MENDOZA exited MENDOZA'S VEHICLE, Agents placed a cellular phone call to (707) 972-1252, subscribed to and believed to be used by MENDOZA. Agents then observed MENDOZA reach into MENDOZA's left pocket and

---

[2] I know from my training and experience that individuals engaged in drug trafficking will often try to disguise their illegal activity in an effort to avoid law enforcement detection and identification. This can include registering a vehicle in the name of another real individual, or in the name of an entirely fictitious individual, or using a vehicle which belongs to another individual.

[3] These investigative techniques also returned two other phone numbers that were associated with MENDOZA's name.  During the course of the investigation, DEA agents and intelligence analysts have not found any evidence suggesting that MENDOZA is actively using those other phone numbers.

AFFIDAVIT

17

pull out a device. MENDOZA looked at and then contacted the device. At this time, a DEA agent began conversing on the phone with an adult male, believed to be MENDOZA. Agents observed MENDOZA appear to hold the phone up slightly towards MENDOZA's ear. A few seconds later, after SA Borges ended the phone call, MENDOZA lowered the cell phone and continued walking.

29.    From September 2025, an administrative subpoena was submitted to VERIZON for (925) 667-5587 (JOHNSON'S CELL PHONE), which returned "Jessy Johnson" as the listed subscriber with an address of 2101 East Linwood Avenue, Turlock, California 95380.

30.    Another administrative subpoena served in January 2026 to Verizon for JOHNSON's CELL PHONE returned a Verizon account subscribed to Jessy Johnson with a business name of "JJ Consulting and Advertising" with an address of 2101 East Linwood Avenue, Turlock, CA 95380 (JOHNSON'S RESIDENCE).

31.    A public review of a Cash App account linked to JOHNSON's CELL PHONE showed username "$JDawg209" with nickname "Jessy Johnson."  I believe that JDawg209 is JOHNSON's nickname followed by the local 209 area code.

32.    Using data returned from the administrative subpoena served to Verizon for MENDOZA's CELL PHONE, DEA intelligence analysts discovered a frequent contact, (209) 570-4642 (later identified as PEREZ'S CELL PHONE) of MENDOZA's.

33.    In January 2026, an administrative subpoena served for PEREZ's CELL PHONE number to Verizon returned a subscriber of Raquel Belen Gomez-Velazco with a listed address of 331 East Fifth Street, Crows Landing, California 95313.[4]  This address is the listed residence on PEREZ's California DMV record, as well as PEREZ's common residence that was identified during this investigation.

34.    DEA intelligence analysts also reviewed law enforcement databases that confirmed PEREZ as the user of PEREZ's CELL PHONE number.

---

[4] I know from my training and experience that individuals engaged in drug trafficking will often try to disguise their illegal activity in an effort to avoid law enforcement detection and identification. This can include registering a cell phone in the name of another real individual, or in the name of an entirely fictitious individual.

AFFIDAVIT

18

**C.**      **Agents use a Confidential Informant to discover "Montana's Shop," an online chatroom used by the MENDOZA DTO to arrange drug deals.**

35.      During the month of October 2025, a federal USPIS Task Force Officer (TFO) learned of the existence of an online chatroom, hosted on an encrypted messaging platform, named "TonyMontana611" or "Montana's Shop."  The information about the chatroom was provided by a Confidential Informant (CI-1), who was recruited by this TFO.[5]  During questioning, CI-1 provided substantial information about how the "Montana's Shop" chatroom worked.

   a. CI-1 stated that they have been receiving bulk quantities of drugs via U.S. Mail since 2015.  CI-1 also stated that they had previously purchased controlled substances via an online chatroom hosted on the encrypted messaging application Potato Chat starting in 2025.  CI-1 stated that the individual they purchased these controlled substances through used the Potato Chat Username "@TonyMontana611" and the Potato Chat nickname "Tony Montana."  CI-1 stated that the chatroom they had purchased the drugs through was named "Montanas Shop" or "TonyMontana611" (hereinafter "Montana's Shop").  Based on my training and experience, I believe that the name Tony Montana is likely a reference to the theatrical film "Scarface," the main character of which is a cocaine dealer and drug lord named Tony Montana.

[5] Cooperating Informant, herein after referred to as CI-1, is currently facing drug trafficking charges for possession and distribution of cocaine, as well as possessing a firearm during and in relation to a drug trafficking crime after a large quantity of cocaine was seized from CI-1's residence. CI-1 provided information to law enforcement for potential consideration on his/her pending charges; however, CI-1 has not been given any promises by the government regarding the resolution of his/her case. CI-1's criminal history consists of 2013 conviction of Operating While Under the Influence – 1st Offense.  In 2014, CI-1 was convicted of Operating While Under the Influence – 2nd Offense and Possession of a Controlled Substance, Marijuana – 1st Offense. In 2015, CI-1 was convicted of Driving While License Suspended or Revoked. In 2017, CI-1 was convicted of Possession of Controlled Substance 1st Offense – Possession of Other Schedule I, II Substance.

AFFIDAVIT

19

b.  Using CI-1's cellular phone, the TFO was able to inspect information posted by individuals who had access to Montana's Shop.  Through this inspection, the TFO learned that a main function of the chatroom was to arrange the sale and distribution of controlled substances.  One portion of the chatroom was used to post a "menu" of controlled substances that were available for sale at a given time.  These substances included "PURE COLOMBIAN COCAINE", "PURE CLEAN METH", "MOLLY / MDMA", "XTC" (indicating ecstasy), "KETAMINE," and other drugs.



Photos of the drug menu in the "Montana's Shop" chatroom

c.  Pictures were also attached to the online menu, with a paper in each picture showing "TonyMontana611" and a date (presumably the date on which the picture was taken). The pictures showed packages of processed marijuana, sealed cocaine bricks stamped with the letters "K R," tablets of LSD, ketamine, Farmapram, and ecstasy. From my training and experience, drug traffickers typically take pictures and record videos using cellular devices to show potential customers. I recognized these photos to be taken digitally, potentially via a cell phone.

d.  CI-1 stated that they had purchased drugs via the Montana's Shop chatroom on multiple occasions.  CI-1 stated that they sometimes purchased drugs "insured," which they explained was an option for the purchase such that, if the purchased drugs did not make it

AFFIDAVIT

20

to the destination, the vendor would reship half of the order for free. CI-1 stated that, except for a package that had been intercepted by law enforcement, all of the packages that they had ordered via Montana's Shop had arrived with the correct controlled substances inside.

36. The information provided by CI-1 linked the Montana's Shop chatroom to the MENDOZA DTO. Specifically, CI-1 stated that they had been instructed to ship cash to Postal Mail Box #377 at the Merced UPS Store. During surveillance of the MENDOZA DTO, agents have repeatedly observed MENDOZA visit the Merced UPS Store and retrieve packages. As detailed below, this link was confirmed during a controlled purchase of methamphetamine from the MENDOZA DTO.

    a. CI-1 stated that the vendor had instructed CI-1 to pay for some of their purchases by shipping a parcel containing cash to a specified location. CI-1 showed the TFO a receipt for such a shipment. The location that the vendor had specified was 3144 G St, STE 125, Merced, CA, 95340, PMB #377 (MENDOZA'S UPS STORE BOX). Based on observations made during this investigation, I know that to be an address used by the MENDOZA DTO.

    b. Between October 2025, and February 2026, DEA and METRO Agents have observed MENDOZA drive MENDOZA'S VEHICLE to the Merced UPS Store, retrieve packages suspected to contain cash payments from drug buyers, and then drive to BIG TYME AUTO.

**D.**    **The MENDOZA DTO continues to ship drugs through the mail.**

37. Between December 2025 and February 2026, agents continued to observe members of the MENDOZA DTO use the LASSITER WAREHOUSE to store and ship parcels containing suspected narcotics. Searches of parcels seized during this period resulted in agents discovering suspected MDMA, suspected cocaine, and approximately 2,000 grams of suspected methamphetamine.

    a. On December 9, 2025, a USPS Postmaster contacted me by telephone regarding a parcel being returned to sender. That parcel had been shipped from the Turlock Post Office on November 24, 2025. I requested the Postmaster send that parcel to me for further review and it arrived at the Stockton Domicile on December 15, 2025. During a review of

AFFIDAVIT

21

tracker information and surveillance video, MENDOZA drove to the Turlock Post Office and was visible on video dropping off parcels at the retail counter.  On December 18, 2025, following a positive K-9 sniff, law enforcement obtained a search warrant for the package. The search revealed approximately 8.0 grams of a purple powdery substance, suspected MDMA powder, with packaging consistent of previous packages seized by law enforcement from the MENDOZA DTO.

b.  On December 22, 2025, MENDOZA arrived at the LASSITER WAREHOUSE in MENDOZA'S VEHICLE.  MENDOZA'S VEHICLE's truck bed was filled with large boxes. Pole camera footage indicated that MENDOZA unloaded the large boxes from the bed of the truck and took them into the LASSITER WAREHOUSE. MENDOZA also appeared to grab unidentified items from the cabin of MENDOZA'S VEHICLE and take them into the LASSITER WAREHOUSE.

c.  During the month of December, a review of tracker data, as well as observations from the LASSITER WAREHOUSE pole camera, indicates that MENDOZA and has continued traveling from the LASSITER WAREHOUSE to nearby Post Offices, consistent with the pattern of criminal behavior that Agents had previously observed MENDOZA and MENDOZA'S VEHICLE engage in.  Tracker data also showed MENDOZA'S VEHICLE's visit two additional Post Offices in Keyes and Paradise Station.

d.  On January 13, 2026, law enforcement reviewed vehicle tracker information and noted MENDOZA had arrived at the Ceres Post Office on January 13, 2026, at approximately 4:30 PM.  At approximately 4:45 PM, I arrived at the Ceres Post Office and reviewed surveillance video.  At approximately 4:32 PM, MENDOZA entered the retail lobby with three USPS Priority Mail parcels and placed them on the counter.  At approximately 4:34 PM, MENDOZA re-entered the retail lobby and placed multiple additional parcels on the counter and then left the facility.  Following my review of surveillance video, I reviewed the parcels dropped off at the retail counter and located approximately twenty-seven parcels which matched the video I reviewed.  These parcels bore similar postage labels to MENDOZA's recent shipments from October and November.  I selected one parcel for

AFFIDAVIT

22

further review.  On January 16, 2026, I obtained a federal search warrant for the parcel intercepted on January 13, 2026.  Inside the parcel I discovered approximately 57 grams of suspected cocaine, 60 grams of suspected MDMA (ecstasy), and 424 grams of suspected methamphetamine (in the form of counterfeit Adderall pills).

e. On February 4, 2026, SA Borges reviewed the LASSITER WAREHOUSE pole camera video.  During the review SA Borges observed that on February 2, 2026, at approximately 1:00 PM, JOHNSON was observed loading parcels similar to those seized previously into MENDOZA'S VEHICLE.

f. On February 19, 2026, at approximately 3:55 PM, I arrived at the Ceres Post Office to conduct surveillance.  At approximately 4:46 PM, I observed MENDOZA arrive in MENDOZA'S VEHICLE and park in the front parking lot.  I observed MENDOZA was the only occupant of the vehicle.  MENDOZA exited the vehicle and walked into the post office with two tote bags containing USPS Priority Mail boxes and envelopes.  MENDOZA placed the boxes and envelopes on the retail counter and left the facility.  I reviewed the parcels dropped off at the retail counter and located approximately 25 parcels which bore similar postage labels to MENDOZA's recent shipments from October, November, and January.  I selected one parcel for further review.  On February 20, 2026, I obtained a federal search warrant for the parcel intercepted on February 19, 2026.  Inside I discovered approximately 1,744 grams of suspected methamphetamine in the form of counterfeit Adderall pills.

**E.** **Controlled Buys from the MENDOZA DTO Using CI-1**

38. In December 2025, at the instruction of the TFO, CI-1 used the Montana's Shop chatroom to arrange a controlled purchase of crystal methamphetamine.  Once the price and shipping addresses had been negotiated, agents placed the specified amount of cash in a parcel and sent it to the PMB #377 at the Merced UPS Store.  Shortly after the MENDOZA DTO was given tracking information for the cash, the MENDOZA DTO provided tracking information for a parcel sent to an address provided by CI-1.  When agents seized that parcel, they found that it contained the quantity and type of drugs that they had purchased.

AFFIDAVIT

23

a. Under the direction and supervision of the TFO, CI-1 used their pre-existing Potato Chat account and username to communicate with the MENDOZA DTO via the Montana's Shop chatroom. CI-1 specified a location that the methamphetamine was to be mailed to. The vendor instructed CI-1 to provide payment for the drugs by mailing an envelope containing a specified amount of cash to "Justin S., 3144 G Street STE 125, PMB #377, Merced, CA 953240" (MENDOZA'S UPS STORE BOX) This address is for a location and private mail box (PMB) hosted inside a UPS store. This location and PMB have been previously identified during the course of this investigation via vehicle tracker data and physical surveillance, as being a common pickup location for the MENDOZA DTO.

b. Later that month, CI-1 was notified via the chatroom that the methamphetamine had been placed in the mail. The member of the MENDOZA DTO coordinating the transaction provided CI-1 with tracking information for the parcel containing the drugs. The TFO placed the cash payment in the mail and CI-1 notified the MENDOZA DTO that it was enroute. The MENDOZA DTO provided a tracking number which indicated that the requested quantity of crystal methamphetamine had been shipped to the law enforcement-controlled address from South Gate, California.

c. Law enforcement agents were able to use the tracking information provided by the MENDOZA DTO to locate and seize the package. This package contained three clear plastic bags containing a white crystalline substance. A field drug test indicated a positive return of methamphetamine.

d. CI-1 informed the MENDOZA DTO via the MENDOZA DTO chatroom that the package containing the payment had arrived at the Merced UPS store. When the Merced UPS Store opened next, vehicle tracker information from MENDOZA'S VEHICLE showed that the vehicle went to the parking lot nearest the Merced UPS store and remained there for approximately five minutes. MENDOZA'S VEHICLE then travelled to the LASSITER WAREHOUSE, where agents observed MENDOZA enter the warehouse with a backpack. Minutes later, MENDOZA exited the LASSITER WAREHOUSE, opened MENDOZA'S VEHICLE, and then reentered the LASSITER

AFFIDAVIT

24

WAREHOUSE. Based on this evidence, I believe that MENDOZA, acting as part of the MENDOZA DTO, picked up the cash payment that had been provided in exchange for the three pounds of crystal methamphetamine.

39.    During January 2026, CI-1, acting under the direction and supervision of the TFO, used the same chatroom to arrange an additional controlled purchase of cocaine.  Through a combination of surveillance techniques, agents observed MENDOZA leave the LASSITER WAREHOUSE with the cocaine and drop the parcel off at the Ceres Post Office.

a.    The MENDOZA DTO provided a cryptocurrency wallet address, bc1q2pkp0dfz8rq9fe7hggknsqhyx9f0w61dqyrq3c, for the cryptocurrency to purchase the cocaine to be sent to. Agents then transferred the purchase price of the cocaine, in Bitcoin, to the cryptocurrency wallet address provided by the MENDOZA DTO. After receiving the cryptocurrency, the online chatroom sent a photograph of a shipping label, indicating that the cocaine had been shipped to the address provided by CI-1.

b.    The same day as this second controlled purchase occurred, agents observed MENDOZA'S VEHICLE depart the LASSITER WAREHOUSE. Vehicle tracker data indicated that MENDOZA'S VEHICLE travelled unstopped to the Ceres Post Office. I reviewed CCTV video at the Ceres Post Office and observed MENDOZA arrive at the Ceres Post Office with packages. A review of the packages dropped off at the Ceres Post Office by MENDOZA showed a package with a shipping label and tracking number that matched what the MENDOZA online chatroom had sent during the controlled purchase.

c.    Once this package arrived in the city provided by CI-1 during the controlled purchase, agents located and took custody of the package. Inside of this package was a brick-like substance of cocaine. A field test of the substance came back positive for cocaine.

**F.    Financial investigation reveals the coordinated use of entities, bank accounts, and assets to conceal and integrate the MENDOZA DTO's illicit proceeds.**

40.    As the above investigation revealed the scope of the MENDOZA DTO, agents investigated the financial relationship between the MENDOZA DTO and various corporate entities. This investigation, which has included a review of bank records, escrow files, the blockchain, and

AFFIDAVIT

25

related financial documentation, reveals a coordinated scheme by members of the MENDOZA DTO to convert the illicit proceeds gained through their criminal activity into assets and funds designed to appear legitimate. This structure was carried out through multiple entities, including BIG TYME AUTO, an entity formed and controlled by JOHNSON, as well as J.J. Properties Inc., J.J. Consulting and Advertising Inc., and RE Management LLC, each associated with and controlled by JOHNSON. Corporate filings and bank account records reflect that these entities shared a common address in the JOHNSON'S RESIDENCE, demonstrating that they functioned as part of a coordinated structure rather than independent or even legitimate businesses.

41.    Within this structure and through the controlled purchases discussed above, agents learned that the MENDOZA DTO's drug proceeds were generated in the form of both cash and cryptocurrency. Transactions over approximately $5,000 were typically conducted in cash, while smaller transactions were conducted using cryptocurrency.

    a. Blockchain analysis and cryptocurrency exchange records show that, for drug sales in exchange for cryptocurrency, new cryptocurrency wallet addresses were typically generated for the buyer to deposit their funds. Once the funds were deposited into the wallet address, members of the MENDOZA DTO with access to the wallet addresses then transferred and consolidated the cryptocurrency into downstream wallets under the control of MENDOZA DTO. While the cryptocurrency was being routed from these wallet addresses to intermediary and final destination wallets, it was moved through peel chains and related cyber tools designed to obscure transaction flows, ultimately aggregating into wallets associated with the MENDOZA DTO at hosted cryptocurrency exchanges including Binance, Coinbase, and ChangeNow. Some of these intermediary and final-destination wallets were created during the month of December 2024.

    b. Cash proceeds were primarily deposited into bank accounts maintained by J.J. Consulting and Advertising Inc. and BIG TYME AUTO, totaling over $300,000 since early 2025, when the members of the MENDOZA DTO seemingly started their chat room and associated drug sales. Bank records further show that, in many instances, cash deposited into accounts held by J.J. Consulting and Advertising Inc. and BIG TYME AUTO were

AFFIDAVIT

26

transferred and aggregated into bank accounts maintained in the names of other entities controlled by JOHNSON, including J.J. Properties Inc. and RE Management LLC, as well as JOHNSON'S personal bank accounts at Wells Fargo.

42. Bank records show that on several occasions the aggregated cash was deployed to acquire assets, including vehicles used to facilitate the drug transactions and real estate located in the Eastern District of California. For the real estate transactions, which were largely controlled by JOHNSON, escrow records reflect that these funds were wired to escrow companies as earnest money and down payments. These transactions reflect the MENDOZA DTO's intentional integration and conversion of drug proceeds into assets designed to generate or appear as legitimate income, conduct that is consistent with money laundering, including transactions designed to conceal the source and ownership of proceeds, as well as monetary transactions in criminally derived property.

43. Federal agents and analysts also identified a parallel pattern involving JOHNSON's vehicle purchases.

    a. Bank and financing records show that JOHNSON purchased and financed in his name or in the name of an affiliated entity, such as BIG TYME AUTO, and then rapidly paid down the loan balance using the cash that was deposited into one of the accounts under his control.

    b. Once the vehicle loans were substantially or fully satisfied on an accelerated basis through criminal cash proceeds, JOHNSON sold the vehicle, thereby converting the original cash proceeds into funds that appeared to be derived from legitimate sales transactions.

    c. Through this repeated practice of depositing cash into bank accounts controlled by members of the MENDOZA DTO, then consolidating those funds to acquire assets or acquire assets and then sell them to achieve a high cash balance, members of the MENDOZA DTO, particularly JOHNSON, engaged in a continuous scheme to conceal the nature, source, and ownership of illicit proceeds while promoting and facilitating ongoing financial crimes.

AFFIDAVIT

27

## IV.    TARGET LOCATIONS

### A.    LASSITER WAREHOUSE

44.    As detailed above, the LASSITER WAREHOUSE serves as a logistical hub for the MENDOZA DTO.  MENDOZA has been observed on multiple occasions leaving the LASSITER WAREHOUSE carrying packages that he then takes to U.S. Post Offices and places in the mail.  Many of these packages have been searched and found to contain controlled substances.

45.    MENDOZA, JOHNSON, and PEREZ have each been observed carrying packages into and out of the LASSITER WAREHOUSE.

46.    MENDOZA has been observed visiting the Merced UPS Store, likely to pick up suspected drug proceeds, and then travelling to the LASSITER WAREHOUSE.

47.    A check of USPS business records between September and October 2025, shows that no mail was received at the LASSITER WAREHOUSE, indicating a lack of legitimate business activity being conducted at this location.

48.    GPS location data for MENDOZA'S VEHICLE show that it is in the vicinity of the LASSITER WAREHOUSE continually and consistently during the afternoon hours on at least weekdays starting in October 2025, and as recently as March 2025.

49.    The LASSITER WAREHOUSE includes both 2721 and 2731 Lassiter Lane addresses. Based on a check of USPS business records, 2731 Lassiter Lane is not a valid address.  2731 Lassiter Lane may be a subdivided office section of the warehouse but based on the lack of valid addressing in USPS databases it is more likely than not to be connected to the drug operation in the LASSITER WAREHOUSE.

### B.    Jose Alverto MENDOZA

50.    As detailed above, MENDOZA is a central figure in the MENDOZA DTO. MENDOZA has been observed transporting parcels from the LASSITER WAREHOUSE to various U.S. Post Offices on multiple occasions.  Agents have searched more than a dozen of those parcels, and all searched parcels were found to contain controlled substances.

51.    MENDOZA has been observed using a key to access the LASSITER WAREHOUSE. MENDOZA has also been observed carrying packages into and out of the LASSITER WAREHOUSE.

AFFIDAVIT

28

52.     MENDOZA has also been observed visiting the Merced UPS Store.  Based on the information obtained from CI-1 during the two controlled buys, the Merced UPS Store is used by the MENDOZA DTO to receive payments for drugs that it sells via the Montana's Shop chatroom.

53.     MENDOZA is listed as the Assistant Secretary for BIG TYME AUTO, and has been seen travelling to BIG TYME AUTO on multiple occasions.  This includes occasions when MENDOZA visited the Merced UPS Store, likely to pick up suspected drug proceeds, and then traveled directly to BIG TYME AUTO.

54.     In October 2025, an administrative subpoena was submitted to VERIZON for (707) 972-1252, which returned "Jose Alverto MENDOZA" as the listed subscriber with an address of P.O. Box 971, Boonville, California.

**C.     MENDOZA'S CELL PHONE**

55.     In October 2025, an administrative subpoena was submitted to VERIZON for (707) 972-1252, which returned "Jose Alverto MENDOZA" as the listed subscriber with an address of P.O. Box 971, Boonville, California.

56.     Also in October 2025, SA Borges placed a ruse call to telephone number (707) 972-1252, while agents were conducting surveillance on MENDOZA.  MENDOZA was observed taking his cell phone out of his pocket and beginning a conversation, which based on observations was the same phone call placed by SA Borges.

**D.     MENDOZA'S RESIDENCE**

57.     As detailed above, MENDOZA has been observed leaving MENDOZA'S RESIDENCE immediately before mailing a parcel containing 3,628 grams of THC vape pens in September 2025.

58.     MENDOZA has also been observed using MENDOZA'S RESIDENCE to prepare a package that was later picked up by PEREZ and transported to JOHNSON'S RESIDENCE.

59.     A check of USPS business records as of March 4, 2026, shows that MENDOZA is actively getting mail in his name at MENDOZA'S RESIDENCE.

60.     GPS location data for MENDOZA'S VEHICLE shows that it is in the vicinity of MENDOZA'S RESIDENCE continually and consistently during overnight hours starting in September 2025 and as recently as March 2026.

AFFIDAVIT

29

**E.     MENDOZA'S VEHICLE**

61.     A check of California DMV records show that MENDOZA'S VEHICLE is registered to JOSE ALVERTO MENDOZA, or Maria Luz Mendoza Medina, 865 Jessica Street, Turlock, California 95380.

62.     Surveillance and GPS location data shows that MENDOZA'S VEHICLE is frequently used to carry parcels believed to contain controlled substances from the LASSITER WAREHOUSE to various U.S. Post Offices for shipping.  MENDOZA'S VEHICLE is also used to transport suspected drug proceeds from the Merced UPS Store to BIG TYME AUTO and the LASSITER WAREHOUSE.

63.     As recently as February 19, 2026, law enforcement observed MENDOZA enter the driver seat of the MENDOZA VEHICLE.

**F.     MENDOZA'S UPS STORE BOX**

64.     As detailed above, the MENDOZA DTO directed CI-1 to send cash payments to the UPS Store Private Mail Box (PMB) number 377 located at the UPS Store located at 3144 G Street, Merced, California 95340.  MENDOZA has visited this location on multiple locations and retrieve multiple boxes before traveling directly to either the LASSITER WAREHOUSE or BIG TYME AUTO.

65.     A check of USPS business records shows that this box was rented to a "Justin Selph".  A check of DMV records indicates Justin Selph is a real person, but Selph has not been identified in any other way relative to this case.[6]  The DMV records display the same individual which was found on the identification document found in USPS business records provided by the UPS Store.

**G.     Jessy JOHNSON**

66.     As detailed above, JOHNSON is a central figure in the MENDOZA DTO.  JOHNSON has been observed accessing the LASSITER WAREHOUSE on multiple occasions.  JOHNSON has been observed using a key to access the LASSITER WAREHOUSE, and he has also been observed carrying parcels in and out of the LASSITER WAREHOUSE.

67.     In a corporate filing with the State of California, JOHNSON is listed as the CEO of BIG

---

[6] I know from my training and experience that individuals engaged in drug trafficking will often try to disguise their illegal activity in an effort to avoid law enforcement detection and identification. This can include registering a Private Mail Box in the name of another real individual, or in the name of an entirely fictitious individual.

AFFIDAVIT

30

TYME AUTO.

68.    JOHNSON receives mail at the JOHNSON RESIDENCE and at BIG TYME AUTO. JOHNSON also receives mail with both his own name, "JJ Properties Inc", "J.J. Consulting and Advertisement Inc.", "BIG TYME AUTO REPAIRS C/O JESSY JOHNSON", all at the JOHNSON RESIDENCE.

**H.    JOHNSON'S CELL PHONE**

69.    In September 2025, an administrative subpoena submitted to Verizon identified Jessy JOHNSON, with an address at JOHNSON'S RESIDENCE, as the subscriber for the cell phone number (925) 667-5587 (JOHNSON'S CELL PHONE).

70.    In January 2026, another administrative subpoena sent to Verizon revealed a business account in JOHNSON'S name.  That account was subscribed under the name "JJ Consulting and Advertising," and it listed JOHNSON'S RESIDENCE as its address.

71.    A public review of a Cash App account linked to JOHNSON's CELL PHONE showed username "$JDawg209" with nickname "Jessy Johnson." I believe that JDawg209 is JOHNSON's nickname followed by the local 209 area code.

**I.    JOHNSON'S RESIDENCE**

72.    As detailed above, JOHNSON is believed to reside at JOHNSON'S RESIDENCE. JOHNSON has been observed coming and going from that residence with a frequency and timing that is consistent with JOHNSON residing at JOHNSON'S RESIDENCE.

73.    As detailed above, PEREZ has been observed transporting parcels from MENDOZA'S RESIDENCE and BIG TYME AUTO to JOHNSON'S RESIDENCE.

74.    A check of USPS business records between February and March 2026 shows that JOHNSON is actively getting mail in his name at the JOHNSON RESIDENCE.

75.    In the corporate filing for BIG TYME AUTO, JOHNSON is listed as the CEO, and JOHNSON'S RESIDENCE is listed as his mailing address.

76.    GPS location data for MENDOZA's and PEREZ'S VEHICLES shows that they are frequently in the vicinity of JOHNSON's RESIDENCE.

77.    I observed PEREZ'S VEHICLE was at JOHNSON's RESIDENCE as recently as March

4, 2026.

## J.    JOHNSON'S VEHICLE

78.    A check of California DMV records show that the JOHNSON VEHICLE is registered to "Jessy Robert Johnson, 2101 E Linwood Ave., Turlock, CA 95380."

79.    As recently as September 2025, law enforcement observed JOHNSON enter the driver seat of the JOHNSON VEHICLE.

80.    As recently as February 2, law enforcement observed the JOHNSON VEHICLE parked at the LASSITER WAREHOUSE concurrently with the MENDOZA VEHICLE.

## K.    Alejandro Felguerez PEREZ

81.    As detailed above, PEREZ is a central figure in the MENDOZA DTO.  PEREZ has been observed accessing the LASSITER WAREHOUSE on multiple occasions.  PEREZ has been observed using a key to access the LASSITER WAREHOUSE, and he has also been observed carrying parcels in and out of the LASSITER WAREHOUSE.

82.    PEREZ has also been observed driving PEREZ'S VEHICLE on trips that I believe are in furtherance of the business of the MENDOZA DTO.  This includes trips where PEREZ transported packages from MENDOZA'S RESIDENCE to BIG TYME AUTO and then to JOHNSON'S RESIDENCE.

## L.    PEREZ'S CELL PHONE

83.    Using data returned from the administrative subpoena served to VERIZON for MENDOZA's CELL PHONE, DEA intelligence analysts discovered that MENDOZA was in frequent with the cell phone number (209) 570-4642.

84.    In January 2026, agents served an administrative subpoena for (209) 570-4642 to VERIZON.  The return indicated that the number was assigned to a subscriber named Raquel Belen Gomez-Velasco with a listed address of 331 E. Fifth Street, Crows Landing, CA. This address is the listed residence on PEREZ's California DMV record, as well as PEREZ's common residence that was identified during this investigation.

85.    DEA intelligence analysts also reviewed law enforcement databases which confirmed that (209) 570-4642 is used by PEREZ.

AFFIDAVIT

32

**M.     PEREZ'S VEHICLE**

86.     A check of California DMV records shows that the PEREZ VEHICLE is registered to "Bryan Osbaldo Mendoza, 2855 Oleander Ave., Merced, CA 95340."[7]

87.     PEREZ'S VEHICLE has been driven by PEREZ in furtherance of the business of the MENDOZA DTO.  This includes trips where PEREZ transported packages from MENDOZA's RESIDENCE to BIG TYME AUTO and then to JOHNSON's RESIDENCE.

**N.     BIG TYME AUTO**

88.     As detailed above, MENDOZA has been observed picking up packages from the Merced UPS Store and then driving to BIG TYME AUTO.  MENDOZA has also been observed leaving BIG TYME AUTO and arriving at the LASSITER WAREHOUSE before later leaving and mailing a parcel containing drugs.

89.     As detailed above, PEREZ and MENDOZA have been observed carrying parcels from MENDOZA'S RESIDENCE to BIG TYME AUTO and then to JOHNSON'S RESIDENCE.

90.     A law enforcement check of utility records for BIG TYME AUTO indicates that Jessy JOHNSON is the utility subscriber.

91.     A public-records check revealed that BIG TYME AUTO is a corporate entity registered in California under the name "Big Tyme Auto Repair Inc."  The Chief Executive Officer of this entity is Jessy JOHNSON, with a mailing address at JOHNSON'S RESIDENCE.  MENDOZA is listed as the corporation's Assistant Secretary.

92.     A check of USPS business records between February and March 2026, shows that JOHNSON and BIG TYME AUTO REPAIR received mail at BIG TYME AUTO.

**V.     COMMON CHARACTERISTICS OF DRUG TRAFFICKERS AND THEIR DRUG TRAFFICKING ACTIVITIES**

93.     Based on my training, experience, and conversations with other law enforcement officers,

---

[7] I know from my training and experience that individuals engaged in drug trafficking will often try to disguise their illegal activity in an effort to avoid law enforcement detection and identification. This can include registering a vehicle in the name of another real individual, or in the name of an entirely fictitious individual.  In this case, the address at which PEREZ'S VEHICLE is registered, 2855 Oleander Ave, is immediately adjacent to the address of MENDOZA'S RESIDENCE.

AFFIDAVIT

33

I know that persons engaged in the smuggling and distribution of controlled substances maintain the fruits, instrumentalities, and evidence of their criminal activities at their residences, in their vehicles, and in other locations under their control.  These items include travel records, shipping and mailing documents, financial records, discarded packaging or packaging materials, personal address/telephone books, U.S. currency, drug use paraphernalia, photographs, and cellular telephones.  Persons engaged in drug smuggling and trafficking commonly maintain addresses or telephone numbers in books, papers, or electronic storage media which reflect names, addresses, and/or telephone numbers of their suppliers, associates, partners, or customers.

94.    Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers will typically meet in person, for short durations, and typically in locations hidden from view of the public and/or surveilling law enforcement. Oftentimes, such meetings will occur at the respective house of the drug trafficker and/or co-conspirator, or in an area requiring a unique access code, such as a personal storage unit facility.

95.    Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers generally pay one another in cash for the purchase of or sale of controlled substances.  I know that drug traffickers will also use mobile banking applications, such as CashApp and Venmo, wire transfers, and other forms of payment for their drug transactions, in an attempt to conceal the transfers of currency and to avoid suspicion and detection by law enforcement.  Furthermore, I know that by using mobile banking applications, drug traffickers can transfer currency between one another without having to physically enter a bank and subjecting themselves to being captured on surveillance video or being required to produce identification.

96.    Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers also use cellular telephones and other electronic communication devices to communicate with other co-conspirators about methods and places of delivery, the types and quantities of drugs involved in a particular transaction, and to alert other traffickers or co-conspirators about the presence of law enforcement.

97.    Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers, as well as criminal co-conspirators, will often possess and use more than

AFFIDAVIT

34

one phone or phone number to communicate with one another, either by voice or text message. I know that drug traffickers, as well as criminal co-conspirators will often subscribe the account under another's name, a moniker, or a fictitious name to avoid detection by law enforcement.

98.    Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers also often possess papers, letters, billings, documents, and other writings which show ownership, dominion, and control of their residence and/or vehicle.  These documents may be in paper or electronic format and may be stored in electronic devices such as a cell phone.

99.    Based on my training, experience, and conversations with other law enforcement officers, I know that drug traffickers attempt to hide or conceal the source of their proceeds.  Drug traffickers may hide caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from engaging in drug trafficking activities.  Further, drug traffickers often attempt to legitimize their profits.  To do so, traffickers may utilize domestic banks and their attendant services, securities, cashier's checks, safe deposit boxes, money drafts, letter of credit, brokerage houses, real estate, shell operations, and business fronts.  Persons involved in drug trafficking and/or money laundering keep papers relating to these activities for future reference.  Narcotic traffickers often keep large amounts of U.S. currency in order to maintain and finance their ongoing drug business.

100.    It is common for drug dealers to also be users of their product, and it is common for the drug user to keep paraphernalia, such as syringes, pipes, spoons, containers, straws, razor blades, and other items which are associated with the use of controlled substances.  Drug dealers also commonly possess paraphernalia associated with the manufacture and sale of controlled substances, such as scales, sifters, containers, cutting agents and packaging materials.  Drug traffickers also commonly possess firearms and other weapons which are used to protect and secure a drug trafficker's property.

101.    Based on my experience, evidence of drug trafficking, such as the items described above, is likely to be found where the drug dealers reside, even absent direct evidence of criminal activity at the residence.  Additionally, I know that drug dealers sometimes attempt to insulate themselves from detection by law enforcement by utilizing separate addresses from their actual residence to store illegal

AFFIDAVIT

35

drugs and currency derivative of their drug trafficking.

## VI.   CELLULAR TELEPHONES AND DIGITAL DEVICES

102.   As set forth above, I know that MENDOZA has communicated about drug trafficking through his cell phone.  I am also aware that drug traffickers often use multiple phones in order to avoid detection from law enforcement if one of their phone numbers is compromised.

103.   I also know based on my training and experience that cellular telephones are commonly used by drug traffickers to organize the acquisition and distribution of controlled substances, and therefore the information to be found on cellular telephones is useful in identifying and/or verifying the user of the telephone and his/her co-conspirators.  Cellular devices today can serve several functions: telephones, text messaging, cameras, personal digital assistants, calendars, address books, mini-computers allowing for electronic mail services, internet services, and rudimentary word processing.

104.   The digital, cellular, and/or telephone numbers and/or the direct connect numbers assigned to the device, as well as the device's serial number, allow law enforcement to discover subscriber information as well as other devices that the target device has communicated with which, in turn, would lead to more subscriber information.  The call and direct connect history information can reveal specific information about the phone numbers that the target devices have communicated as well as the time and duration of those calls.  The list of contacts stored on the device potentially names co-conspirators in the crime.

105.   Information on the device that does not lead to co-conspirators is still useful in identifying the user of the device (for example, if "Mom" appears in the address book of the phone, which contact will likely help identify the user of the phone).

106.   Drug traffickers at times use cell phones to take photos, videos, or audio files documenting their drug transactions or the contraband or proceeds. Digital media, such as photos, videos, or audio files, allow law enforcement to potentially discover co-conspirators in the crime or discover types, amounts and prices of drugs trafficked as well as dates, places, and amounts of specific transactions.

107.   Drug traffickers at times use cell phones for financial transactions related to drug

AFFIDAVIT

trafficking activity. Financial data on cell phones therefore allow law enforcement to potentially discover co-conspirators in the crime or discover prices and dates of specific drug transactions.

108.    Drug traffickers commonly use location services on cell phones to store addresses and navigate routes used in drug trafficking activity, such as addresses of locations where drugs are stored, co-conspirator addresses, and locations of drug deals. Location information on cell phones allows law enforcement to discover information about drug trafficking activity, such as the location of drugs, addresses and dates of drug transactions, and names and addresses of co-conspirators.

109.    Drug traffickers commonly use internet browsers on cell phones to access financial information, communicate with co-conspirators, and facilitate drug trafficking activities. Records of internet activity therefore allow law enforcement to discover information about drug trafficking activity, such as types of drugs, dates of transactions, and names of co-conspirators.

110.    The warrant I am applying for would permit law enforcement to obtain the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.

AFFIDAVIT

37

The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

111.    As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

112.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours

AFFIDAVIT

38

*and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

113.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

114.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## VII.    ELECTRONIC STORAGE AND FORENSIC ANALYSIS

115.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long period of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on those devices.  This information can sometimes be recovered

AFFIDAVIT

39

with forensics tools.

116.    Forensic Evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on those devices because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently alive.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

AFFIDAVIT

40

about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

117. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

118. Nature of Examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of electronic devices consistent with this warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

## VIII.    CRYPTOCURRENCY, TECHNICAL BACKGROUND AND SEARCH OF DIGITAL INFORMATION

119. The "dark web," also sometimes called the "darknet," or "dark net" is a colloquial name for a number of extensive, sophisticated, and widely used criminal marketplaces operating on the Internet, which allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply "web"). These online black-market websites use a variety of technologies, including the Tor network (defined below) and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring. A famous dark web marketplace, Silk Road, operated similar to legitimate commercial websites such as Amazon and eBay, but offered illicit goods and services. Law enforcement shut down Silk Road in 2013. Currently operating, popular dark web marketplaces are White House, DarkMarket and Deep Sea.

120. Cellular "smart phones" can connect to the internet, including the dark web, and can be utilized to manage a drug vendor account as well as conduct digital currency transactions.

121. "Vendors" are the dark web's sellers of goods and services, often of an illicit nature, and they do so through the creation and operation of "vendor accounts." Customers, meanwhile, operate "customer accounts." It is possible for the same person to operate one or more customer accounts and one or more vendor accounts at the same time.

41

122.    "The Onion Router," "Tor network," or simply "Tor," is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users. Tor likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the Tor network.  Such "hidden services" operating on Tor have complex web addresses, generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software, including a major dark web browser known as the "Tor Browser," designed to access the Tor network.  One of the logos, or "icons," for the Tor Browser is a simple image of the Earth with purple water and bright green landmasses with bright green concentric circles wrapping around the planet to look like an onion.

123.    Some software used to access the dark web does not permanently store images of the websites and or other data that are visited on the computer that is running the software.

124.    Digital currency (also known as cryptocurrency or virtual currency)[8] is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government).  Digital currency exists entirely on the Internet and is not stored in any physical form.  Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Digital currency is not illegal in the United States and may be used for legitimate financial transactions.  However, digital currency is often used for conducting illegal transactions, such as the sale of controlled substances.

125.    "Bitcoin" (or "BTC[9]") is a type of online digital currency that allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems. Bitcoins are a decentralized, peer-to-peer form of electronic currency having no association with banks or governments.  Users store their bitcoins in digital "wallets," which are identified by unique electronic

---

[8] For purposes of this affidavit, "digital currency," "cryptocurrency," and "virtual currency" address the same concept.

[9] As of March 18, 2026, one Bitcoin is equal to approximately $70,860.05 USD.

AFFIDAVIT

42

"addresses." A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger. To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key"). The public address can be analogized to an account number while the private key is like the password to access that account. Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the "Blockchain," the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous. Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

126.    Although they are legal and have known legitimate uses, Bitcoins are also known to be used by cybercriminals for money-laundering purposes and are believed to be the most oft-used means of payment for illegal goods and services on "dark web" websites operating on the Tor network. By maintaining multiple bitcoin wallets, those who use Bitcoins for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplace.

127.    Bitcoin is one example of a digital currency; other digital currencies, such as Ethereum, Monero, Litecoin and Zcash, also exist and are used by darknet actors. The technology underlying these currencies are similar, though Monero and Zcash currencies provide more privacy and anonymity to the users.

128.    Exchanges and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a

AFFIDAVIT

43

cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, KeepKey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code[10] with the public and private key embedded in the code.  Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password.  Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).  I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.  The Trezor device offers an advanced passphrase option that incorporates a "25th seed word" that must be enabled to access potentially obscured digital currency assets.

129.    Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device.  A user typically accesses the wallet application by inputting a user-generated PIN code or password.  Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications.  Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates).  As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency.  Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet.  Alternatively, where law

---

[10] A QR code is a matrix barcode that is a machine-readable optical label.

AFFIDAVIT

44

enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

130.    Darknet marketplaces often only accept payment through digital currencies, such as Bitcoin, and operate an escrow whereby customers provide the digital currency to the marketplace, who in turn provides it to the vendor after a transaction is completed.  Accordingly, large amounts of Bitcoin sales or purchases by an individual can be an indicator that the individual is involved in drug trafficking or the distribution of other illegal items.  Individuals intending to purchase illegal items on Silk Road-like websites need to purchase or barter for Bitcoins.  Further, individuals who have received Bitcoins as proceeds of illegal sales on Silk Road-like websites need to sell their Bitcoins to convert them to fiat (government-backed) currency.  Such purchases and sales are often facilitated by peer-to-peer bitcoin exchangers who are not registered with the federal or a state government and who advertise their services on websites designed to facilitate such transactions.  These unregistered exchangers often charge a higher transaction fee than legitimate, registered digital currency exchangers. This higher fee is essentially a premium that the unregistered exchangers charge in return for not filing reports on the exchanges pursuant to the Bank Secrecy Act, such as CTRs and SARs.

131.    Your affiant is aware that vendors of narcotics on the Internet use computers, including smart phones, to access the web and conduct narcotic sales.  Your affiant is also aware that individuals must use an electronic device to locate and communicate with bitcoin exchangers and purchase bitcoins.  Users of bitcoin must establish electronic wallets to receive and send bitcoins.  These wallets are electronic in nature and may be stored on mobile devices (phones or tablets), external or removable media, and/or computers.  Your affiant is aware that once contact is made with a bitcoin exchanger on a digital currency exchange platform, all subsequent contact and transactions can be conducted from one phone to the other during a face to face transaction, exchanging currency for bitcoins.  Your affiant is also aware that users can back-up wallets to paper printouts that would contain information to restore the wallet in an electronic form (cold storage).  Passwords for access electronic wallets, are typically complex and are often written down or saved in an accessible manner on paper or on some electronic

AFFIDAVIT

45

device. There is probable cause to believe that such items are located in the TARGET LOCATIONS.

132.    As described above and in Attachment B, your affiant submits that computers, smart phones, and possibly other storage media will likely be found within the TARGET LOCATIONS and there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  Furthermore, your affiant submits that sufficient probable cause has been established to search and seize any online digital currency exchange platform accounts, and the data contained therein, located on seized digital devices.

133.    The warrant I am applying for would permit law enforcement to compel certain individuals to unlock a device subject to seizure pursuant to this warrant using the device's biometric features.  I seek this authority based on the following:

a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

AFFIDAVIT

46

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law

AFFIDAVIT

47

enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Nevertheless, law enforcement is seeking authority to require MENDOZA, JOHNSON, and PEREZ, who is found at the Target Premises and reasonably believed by law enforcement to be a user of the computer, to unlock any computer reasonably believed to contain evidence of

AFFIDAVIT

48

the Target Offenses, by using biometric unlock features in the same manner as discussed above.

134. Due to the foregoing, if law enforcement personnel encounter a device that is subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of MENDOZA, JOHNSON, and PEREZ, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device(s), to the fingerprint scanner of the device(s) found at the premises; (2) hold the device(s) found at the premises in front of the face of MENDOZA, JOHNSON, and PEREZ, and activate the facial recognition feature; and/or (3) hold the device(s) found at the premises in front of the face of MENDOZA, JOHNSON, and PEREZ, and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

### IX.    <u>AUTHORIZATION REQUEST</u>

135. Based on the foregoing, I submit there is probable cause to believe that MENDOZA, JOHNSON, PEREZ, and others, are engaged in conspiracy to distribute and possess with intent to distribute controlled substances, possession with intent to distribute controlled substances, illegal use of the mails in furtherance of narcotics trafficking, and money laundering.  There is probable cause to search the locations described in Attachments A-1 through A-14, incorporated here by reference, for evidence that MENDOZA, JOHNSON, PEREZ, and other known or unknown members of the MENDOZA DTO have committed or are committing a violation of the TARGET OFFENSES.  I therefore respectfully request that the Court issue a warrant authorizing the search of the TARGET LOCATIONS, as set forth in the affidavit and attachments, and authorize seizure of evidence, fruits and instrumentalities of the TARGET OFFENSES, as more specifically described in Attachment B.

136. I further request that the Court seal the warrant, the affidavit, and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served by Special Agents and other investigative and law enforcement officers of USPIS, federally deputized state and local law enforcement officers, and other

AFFIDAVIT

49

government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.  These documents discuss an ongoing criminal investigation that is neither public nor known to the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.  Sealing these documents will help ensure the safety of agents and others.

Respectfully submitted,

_____

Jedediah Tyler
Postal Inspector
U.S. Postal Inspection Service

Subscribed and sworn to telephonically on:

_____

_____
Hon. Allison Claire
U.S. MAGISTRATE JUDGE

/s/ Charles Campbell
Approved as to form by AUSA CHARLES CAMPBELL

AFFIDAVIT

50